The CHIEF JUSTICE
 

 delivered the opinion of the court.
 

 This controversy concerns seventy-two bales of cotton captured in May, 1864, on the plantation of Mrs. Elizabeth Alexander, on the Red River, by a party sent from the Ouachita, a gunboat belonging to Admiral Porter’s expedition. The United States insist on the condemnation of the cotton as lawful maritime prize. Mrs. Alexander claims it as her private property. The facts may be briefly stated.
 

 In the spring of 1864, a naval force, of the United States, under Rear Admiral Porter, co-operating with a military force on land, under Major-General Banks, proceeded up Red River towards Shreveport, in Louisiana. The whole region at the time was in rebel occupation, and under rebel rule.' Fort De Russy, about midway between the mouth of the river and Alexandria, was captured by the Union troops-about the middle of March. The insurgent troops gradually retired until a considerable district of country on Red River came under the control of the national forces. This control, however, was of brief continuance. An unexpected reverse befell the expedition. The army under General Banks was defeated, and was soon after entirely withdrawn from the Red River country. The naval force, under AdmiralPorter,.
 
 *418
 
 necessarily followed, and rebel rule and ascendency were again complete and absolute. The military occupation by the Union troops lasted rather less than eight weeks. Its duration was measured by the time required for the advance and retreat of the army and navy. The Parish of Avoyelles was a part of the district thus temporarily occupied; and the -plantation of Mrs. Alexander was in this parish, and upon the river. The seventy-two bales of cotton in controversy were raised on the plantation, and were stored in a warehouse about a mile from the river bank. A party from the Ouachita, under orders from the naval commander, landed on the plantation about the 26th of March, and took possession of the cotton. It was sent to Cairo; libelled as prize of war in the District Court for the Southern District of Illinois; claimed by Mrs. Alexander; and, by decree of the District Court, restored to her. The United States now ask for the reversal of this decree, and the condemnation of the property as maritime prize.
 

 After the seizure of the cotton, Mrs. Alexander took the oath required by the President’s proclamation of amnesty. The evidence in relation to her previous personal loyalty is somewhat conflicting. She had furnished mules and slaves, involuntarily as alleged, to aid in the construction of the rebel Fort De Pussy. She now remains in the rebel territory. Before the retreat of the Union troops, elections are stated to have been held, under military auspices, for delegates to a constitutional convention about to meet in New Orleans.
 

 These facts present the question: Was this cotton lawful maritime prize, subject to the prize jurisdiction of the courts of the United States ? ■
 

 There can be no doubt, we think, that it was enemies’ property. The military occupation by the national military forces was too limited, too imperfect, too brief, and too precarious to change the enemy relation created for the country ■and its inhabitants by three years of continuous rebellion; interrupted, at last, for a few weeks; but immediately renewed, and ever sinc'e maintained. The Parish of Avoyelles,
 
 *419
 
 ■which included the ¿otton plantation of Mrs. Alexander, included also Fort De R.ussy, constructed in part by labor from the plantation. The rebels reoccupied the fort as-soon as it was evacuated by the Union troops, and have since kept possession.
 

 It is said, that though remaining in rebel territory, Mrs. Alexander has no personal sympathy with the rebel cause, and that her property therefore cannot be regarded as enemy property; but this court cannot inquire into the personal character and dispositions of individual inhabitants of enemy territory. We must be governed by the principle of public law, so often announced from this bench as applicable alike to civil and international wars, that all the people of each State or district in insurrection against the United States, must be regarded as enemies, until by the action of the legislature and the executive, or otherwise, that relation .is thoroughly and permaAently changed.
 

 We attach no importance, under the circumstances, to the elections said to have been held for delegates to the constitutional convention.
 

 Being enemies’ property, the cotton was liable .to capture and confiscation by the adverse party.
 
 *
 
 It is true that this rule, as to property on land, has received very important qualifications from usage, from the reasonings of enlightened publicists and from judicial decisions. It may now be regarded as substantially restricted “ to special cases dictated by the necessary operation of the war,”
 
 †
 
 and as excluding, in general, “the seizure of the private property of pacific persons for the sake of gain.”
 
 ‡
 
 The commanding general may determine in what special cases its more stringent application is required by military emergencies; while considerations of public policy and positive provisions of law, and the general spirit of legislation, must indicate the cases m which its application may be properly denied to the property of non-combatant enemies.
 

 In the case before us, the capture seems to have been jus
 
 *420
 
 tified by the peculiar character of the property and by legislation. It is well known that eottop has constituted the chief reliance of the rebels for means to purchase the munitions of war in Europe. It is matter of history, that rather than permit it to come into the possession of the national troops, the rebel government has everywhere devoted it, however owned, to destruction. The value of that destroyed at New Orleans, just before its capture, has been estimated at eighty millions of dollars. It is in thé record before us, that on this very plantation of Mrs. Alexander, one year’s crop was destroyed in apprehension of an advance of the Union forces. The rebels regard it as one of their main sinews of war; and no principle of equity or just policy required, when the national occupation was itself precarious, that it should be spared from capture and allowed to remain, in case of the withdrawal of the Union troops, an element of strength to the rebellion.
 

 And the capture was justified- by legislation as well as by public policy. The act of Congress to confiscate property used for insurrectionary purposes, approved August 6th, 1861, declares all property employed in aid of the rebellion, with consent of the owners, to be lawful subject of prize and capture wherever found.
 
 *
 
 And it further provided, by the act to suppress insurrection, and for other purposes, approved July 17, 1862,
 
 †
 
 that the property of persons who had aided the rebellion, and should not return to allegiance after the President’s warning, should be seized and confiscated. It is in evidence that Mrs. Alexander was a rebel enemy at the time of the enactment of tlfis act; that she contributed to the erection of Port De Pussy, after the passage of the act of July, 1862, and so comes within the spirit, if not within the letter, of the provisions of both.
 

 If, in connection with these acts, the provisions of the Captured and Abandoned Property Act of March 12,1863,
 
 ‡
 
 be considered, it will be difficult to conclude that the capture under consideration was not warranted by law. This
 
 *421
 
 last-named act evidently contemplated captures by the naval forces distinct from maritime prize; for the Secretary of the Navy, by his order of March 31, 1863, directed all officers and sailors to turn over to the agents of the Treasury Department all property captured or seized in any insurrec-tionary district, excepting lawful maritime prize.
 
 *
 

 Were this otherwise, the result would not be different, for Mrs. Alexander, being now a resident in enemy territory, and in law an enemy, can have no standing in any court of the United States so long as that relation shall exist. Whatever might have been the effect of the amnesty, had she removed to a loyal State after taking the oath, it can have none on her relation as enemy voluntarily resumed • by continued residence and interest.
 

 But this reasoning, while it supports the lawfulness of the capture, by no means warrants the conclusion that the property captured was maritime prize. We have carefully considered all the cases cited by the learned counsel for the captors, and are satisfied that neither of them is an authority for that conclusion. In no one of these-cases does it appear that private property on land was held to be maritime prize; and on the other hand, we have met with no case in which the capture of such private property was held unlawful except that of Thorshaven.
 
 †
 
 In this case such a capture was held unlawful, not because the property was private, but because it was protected by the terms of a capitulation. The rule in the British Court of Admiralty seems to have been that the court would take jurisdiction of the capture, whether of public or private property; and condemn the former for the benefit of the captors, under the prize acts of Parliament, but retain the latter till claimed, or condemn- it to the Crown, to be disposed of as justice might require. But it is hardly necessary to go into the examination of these English adjudications, as our own legislation supplies all needed guidance in the decision of this case.
 

 
 *422
 
 There is certainly no authority to condemn any property as prize for the benefit of the captors, except under the law of the country in whose service the capture is made; and the whole authority found in our legislation is contained in the act. for the better'government of the navy, approved July 17th, 1862. By the second section of the act,
 
 *
 
 it is provided that the proceeds -of all ships and vessels, and the goods taken on board of them1, which shall be adjudged good prize, shall be the sole property of the captors, or, in certain cases, divided equally between the captors and the United States. By the twentieth section, all provisions of previous acts inconsistent with this act are repealed. This act excludes property on land from the category of prize for the benefit of captors; and seenis to be decisive of the case so far as the claims of captors are concerned.
 

 As a case of lawfully captured property, not for the benefit of captors, its disposition is controlled by the laws relating to such property. By these laws and the orders under them, all officers, military and naval, and all soldiers and sailors, are strictly enjoined, under severe penalties, to turn over any such property which may come to their possession to the agents of the Treasury Department, and these agents are required to sell all such property to the best advantage, and pay the proceeds into the National Treasury. Any claimant of the property may, at any time within two years after the suppression of the rebellion, bring suit in 'the Court of Claims, and on proof of ownership of the property, or of title to the proceeds, and that the claimant has never given aid or comfort to the rebellion, have a decree for the proceeds, deducting lawful charges. In this war, by this liberal and beneficent legislation, a distinction is made between those whom the rule of international law classes as enemies. All, who have in fact maintained a loyal adhesion to the Union, are protected in their rights to captured as well as abandoned property.
 

 It seems that, in further pursuance of the same views, by
 
 *423
 
 an act of ‘tbe next session, Congress abolished maritime prize on inland waters, and required captured vessels and goods on board, as well as all other captured property, to be turned over to the Treasury agents, or to the proper officers of the courts. This act became a law a few weeks after the capture now under consideration, and does not apply to it. It is cited only in illustration of the general policy of legislation, to mitigate, as far as practicable, the harshness of the rules of war, and preserve for loyal owners, obliged by circumstances to remain in rebel States, all property, or its proceeds, to which they have just claims, and which may in any way come to the possession of the Government or its officers.
 

 We
 
 think it clear that the cotton in controversy was not maritime prize, but should have been turned over to the agents of the Treasury Department, to be disposed of under the act of March 12th, 1868. Not having been so turned over, but having been sold by order of the District Court, its proceeds should now be paid into the. Treasury of the United States, in order that the claimant, when the rebellion is suppressed, or she has been able to leave the rebel region, may have the opportunity to bring her suit in the Court of Claims, and, on making the proof required by the act, have the proper decree. -
 

 The decree of the District Court is reversed, and the cause remanded, with directions to
 

 Dismiss the libel.
 

 *
 

 Prize Cases, 2 Black, 687.
 

 †
 

 1 Kent 92.
 

 ‡
 

 Id. 93.
 

 *
 

 12 Stat. at Large, 319.
 

 †
 

 Id. 591
 

 ‡
 

 Id. 820.
 

 *
 

 Report of the Secretary of the Treasury on. the Finances, December 10. 1863, p. 438.
 

 †
 

 Edwards, 107
 

 *
 

 12 Stat. at Large; 606.