Mr. Chief-Justice Waite
delivered the opinion of the court:
The main question presented for our consideration in this case is whether one who gave aid and comfort to the late rebellion can, after the expiration of two years from its suppression, commence and successfully maintain an action in the Court of Claims for the recovery of money in the Treasury arising from the sale of his cotton taken possession of by the United States and sold under the provisions of the Abandoned or captured property Act, (12 Stat. L., 820.)
The case has been argued, to some extent, as though it in *109 volved tbe consideration of a statute of limitations. To our minds tbe question is one of jurisdiction. A sovereign cannot be sued in bis own courts except witb bis consent. This is an action against tbe United States in its own Court of Claims. The appellant must therefore show that consent has been given to its prosecution. That being done, the jurisdiction of tbe court is established, and he may proceed; otherwise, not.
It is conceded that tbe required consent is not contained in the Abandoned or captured property Act itself, for the only-action there consented to is one to be commenced within two years after the suppression of the rebellion. But inasmuch as the United States has consented to be sued in the Court of Claims upon contracts, express or implied, it is contended that this action may be prosecuted on account of an implied promise by the United States to pay to every owner of captured and abandoned property, whether loyal or disloyal, the proceeds of his property taken and sold.
As the taking was under the authority of an act of Congress, we must look to the act to see if this promise has been made. It is not claimed that any exists if it is not to be found there. If it has been made at all, it was when the property was taken, and is equivalent to an undertaking by the United States at that time to receive and hold the property, or its proceeds if sold, in trust for the use and benefit of the owner whoever he might be. The claim is that the trust in favor of the owner having then been created, the remedy for its enforcement in the Court of Claims as a contract was restored to the disloyal owner by the operation of the President’s proclamation December 25, 1868, granting unconditional pardon to all who participated in the rebellion.
The act authorizes the Secretary of the Treasury, from time to time as he shall see fit, to appoint special agents to receive and collect all abandoned or captured property in the insurrec-tionary States, not including, however, any which had been used or was intended to be used for waging or carrying on the war, such as arms, ordnance, ships, munitions of war, &c. Any part of the property collected might be appropriated to public use on due appraisement or certificate thereof, or forwarded to any place of sale in the loyal States, as the public interests might require. All sales were to be at public auction to the highest bidder, and the proceeds paid into the National *110 Treasury. Tbe Secretary of tbe Treasury was required to cause books of account to be kept, showing from whom the property was received, tbe cost of transportation, and tbe proceeds of tbe sale. And any person claiming to have been tbe owner of such property was authorized, at any time within two years after tbe suppression of tbe rebellion, to prefer bis claim to tbe proceeds in tbe Court of Claims, and, on proof of bis ownership, his right thereto, and that be bad not given aid and comfort to tbe rebellion, receive tbe balance of tbe proceeds remaining in the Treasury, after deducting certain expenses.
Such was tbe power to take given by the act, and such tbe obligation assumed by tbe United States upon tbe taking, with the remedy provided for its enforcement. It was evidently a war measure, and tbe statute is to be construed in the light of that fact. It -was confined to private property of the enemy. Public property was expressly excluded. It embraced no private property except such as was abandoned by its owners or liable to capture. The property in this case was cotton, and, according to tbe uniform decisions of this court, tbe subject of capture. (Mrs. Alexanders Cotton, 2 Wall., 419; I'adelford’s Case, 9 ib., 540.) As was said in Mrs. Alexanders Case, cotton was regarded by tbe insurgent government as one of its “ main sinews of war.” It was in fact tbe foundation upon which tbe financial system of tbe rebellion was built. It was a security tbe insurgents offered for tbe payment of their debts. Upon it they relied for their influence abroad. To obtain it, forced contributions were exacted from its owners. From time to time in tbe progress of the war it was found upon tbe enemy’s territory occupied by tbe military forces .of tbe United States. While, when so found, it might have been owned by non-combatant enemies, and in that sense private property, it was in fact, under the circumstances, at least semi-public. If left undisturbed, and the insurgents should repossess themselves of the territory, it would again be placed where it might strengthen tbe rebellion. Its capture was therefore legitimate, not for booty, but to cripple tbe enemyi In that way it was kept out of tbe insurgent treasury. It might have been destroyed, but tbe unnecessary destruction of property ought always to be discouraged. Tbe act of Congress looked to its preservation, but authorized its capture. In so doing Congress acted within its constitu *111 tional power to “ make regulatiotis concerning captures on land and water.’’ (Art. I., sec. 8, par. 11.)
In the indiscriminate seizure which was likely to follow such an authority, it was anticipated that friends as well as foes might suffer. Therefore, to save friends, it was provided thac any person claiming to have been the owner might, at any time within two years after the suppression of the rebellion, prefer his claim, and, upon proof of his ownership and loyalty, receive the money realized by the United States from the sale of his property. That expresses all there is of the trust or the remedy ■provided.
In Klein’s Gase, (13 Wall., 136,) the property collected under this act was said to be of “ a peculiar description, known only in the recent war, called captured and abandoned property,” and that “ the Government recognized to the fullest extent the humane maxims of the modern law of nations which exempts private property of non-combatant enemies from capture as booty of war.” “ No similar legislation,” it was also said, “ is mentioned in history,” and “the Government constituted itself the trustee for those who were hy that act declared entitled to the proceeds of captured and abandoned property, and for those whom it would thereafter recognize as entitled.” And again, (p. 139,) that “ the proceeds of the property have passed into the possession of the Government, and the restoration of the property is pledged to none except those who have continually adhered to the Government. Whether restoration will be made to others, or confiscation will be enforced, is left to be determined by considerations of public policy subsequently to be developed.”
In the same case it was also held (p. 142) that “the restoration of the property became the absolute right of the persons pardoned on application within two years from the close of the war.” Under this construction the effect of the act was to provide a reward for submission to the Government and the acceptance of amnesty, as well as authority for the seizure of property, and it is thus made to operate in two ways to weaken the insurgents: first, by depriving them of their property; and, second, by inducing their adherents to submit to the authority of the United States as a means of regaining that which they had lost personally. In that view time is material. The length of war depends largely upon the relative strength of the contending *112 parties. As a rule, that belligerent is the first to surrender, other things being equal, who first loses the elements of warlike power. Especially is this true in a civil war. Strategy sometimes gives unnatural strength, and thus obtains success, but more commonly war resolves itself into a question of men and money, of strength and endurance.'
According to the doctrine of Klein’s Case, if a suit was commenced within two years, a pardoned enemy could recover as well as a loyal friend. But the commencement of the suit within the prescribed time was a condition-precedent to the ultimate relief. The right of recovery was made to depend upon the employment of the remedy provided by the act. There was no promise even under the rulings in that case, except to such as should commence the suit in time, and upon the trial be in a condition to bring themselves within the requirements of the act. The promise, such as it is, was express. There is no room left for implication. Pardon and amnesty have no effect except as to such as sue in time. In this, Kleins Case but adopts the ruling in previous cases. Thus in Anderson's Vase (9 Wall., 67) the doctrine is stated in these words: “ But by the act in question the Government yielded its right to seize and condemn the property which it took in the enemy’s country, if it belonged to a faithful citizen, and substantially said to him, 1 We are obliged to take the property of friend and foe alike, which we will sell and deposit the proceeds of in the Treasury; and if, at any time within two years after the suppression of the rebellion, you prove satisfactorily that of the property thus taken you owned a part, we will pay you the net amount received from its sale.’” And in Zellner’s Vase, (9 Wall., 24-8:) “Any person claiming to be the owner of abandoned and captured property, within the meaning of the act, may, at any time within two years after the suppression of the rebellion, present his claim to the Court of Claims,” &c. And again, in Armstrong’s Vase, decided at the same time with Klein’s, this is the language of the court, speaking through the late Chief-Justice : “And that the' person so pardoned is entitled to the restoration of the proceeds of captured and abandoned property if a suit be brought within 1 two years after the suppression of the rebellion;’” the special provision as to the time being brought to the attention of the reader by the marks of quotation.
*113 Provisiou might have been made for the institution of suits by loyal owners at any time, but it was not, and the reason may perhaps be found in Klein’s Case. According to that, an insurgent who accepted the offers of pardon which were from time to time extended to him, and became loyal in fact, received, as one of the privileges and immunities to which he was restored, the right to recover the proceeds of the sale of his property taken under the act, if he made his claim in time. To obtain a pardon before the war closed, an insurgent must withdraw himself from the enemy and become loyal. There could be no recovery, even in a suit commenced, until the pardon was obtained, and there could be as soon as it was. Hence the sooner the pardon the sooner the money could be had. So, too, after the contest was over, an early submission by all to the authority of the Government was important. To this the act, as construed, furnished an additional inducement by its promise of restoration if application therefor was made in time.
Additional strength is given to this interpretation of the act by what followed its enactment. On the 17th of July, 1862, the President was authorized by Congress to extend pardon and amnesty by proclamation to persons engaged in the rebellion, with such exceptions and upon such conditions as he should deem expedient. (12 Stat. L., 592.) On the 8th December, 1863, nine months after the passage of the Abandoned or captured property Act, he issued his first proclamation under this authority. (13 Stat. L., 737.) By this he offered full pardon and restoration of property to all insurgents, except a few designated classes, who would take a prescribed oath to the effect generally that they would thereafter abstain from the rebellion and support the Government of the United States. On the 26th March, 1864, by a further proclamation, (13 Stat. L., 741,) he excluded from the operation of the writ prisoners of war and those confined for crime. Thus during the war actual withdrawal from the enemy and an oath of allegiance were made conditions-precedent to amnesty; but on the 29th of May,' 1865, and within three days after the surrender of the last organized army of the rebellion, another proclamation was issued, (13 Stat. L., 758,) offering pardon and restoration of property to all, with certain exceptions, who would take an oath of allegiance alone. On the 7th' September, 1867, but still within two years after the suppression of the rebellion, as it has been determined, *114 another was issued extending the operation of the last to all save three of the excepted classes of persons. (15 Stat. L., 700.). Thus, after the war, simple submission by an insurgent to the authority of the Government was the only price to be paid for pardon and restoration to the right, according to Klein's Case,. of using the means provided by Congress for the recovery of the proceeds of the sale of his captured or abandoned property. Pardon was therefore easy to be had, and the promise of a restoration of this class of property was tendered as a reward for its acceptance to such as would qualify themselves within the prescribed time' to receive it.
This appellant, though one of those who might, did not accept these easy terms. He would not render even this small equivalent for the restoration of his property, and consequently he has not availed himself of the only promise the United States has as yet offered to make looking to that end. The Court of Claims may act upon promises made, but cannot make them.
There is here no question of confiscation. The title of the United States, whatever may be the rights it carries with it, is by authorized capture or appropriation of enemy’s property on land. But the same statute which authorized the capture gave a right to certain persons to demand and receive a restoration of their property taken. Coupled with the right to demand was a provision for the remedy by which it was to be enforced. Both the right and the remedy are, therefore, created by the same statute, and in such cases the remedy provided is exclusive of all others. The demandant in this case neglected to. avail himself of the remedy provided, and consequently he is now without any. That remedy was the only one of which the Court of Claims or any other court has been authorized to take jurisdiction. It is for Congress, not the courts, to determine whether this jurisdiction shall be extended and other remedies provided.
The judgment is affirmed.