Davis, J.,
delivered the opinion of the court:
On the 18th of February, 1863, the claimant was in possession of a plantation in Mississippi, on the river, between Vicksburg and the mouth of the Bed Biver. It had belonged to his testator, and had been left by the will in the occupancy of the executor. As executor, he was the owner of 168 bales of cotton then on the estate. On that day this cotton was seized by the naval forces of the United States for purposes of naval defense, and was taken to Johnson’s Landing, below Vicksburg, hauled across land to Young’s Landing, and there, by order of Admiral Porter, in command of the Mississippi squadron, was put on board the transport Bowena, together with 90 other bales.
On the 7th of March, Admiral Porter reported the capture of this cotton, as required by the Secretary’s general order of August 28,1862, and on the 28th of March the Secretary of the Navy instructed him, in reply, that property captured as “prize property” must be sent to prize courts for adjudication, and that the disposition of captured abandoned property was provided for by the then recent act of Congress, approved March 12, 1863.
On the 31st March or the 1st April the Bowena left Young’s Landing with the 258 bales of cotton, and arrived with them at *40 Cairo, in Illinois, on or about tbe 7th April. There they were delivered to Caiitain Pennock, fleet-officer, acting under Admiral Porter.
On the 9th of April, Captain Pennock lodged with the district attorney for the southern district of Illinois one information against the 258 bales, alleging that a part of it was seized “ at Wilson Mitchell’s Landing,” and that £cthe balance” (which included the claimant’s cotton) “was sent from the Tazoo River by Admiral Porter.”
On the 17th April the district attorney libeled all the cotton, alleging that the 258 bales had been seized at Wilson Mitchell’s Landing, and charging, first, that the seizure had been made for a violation of the non-intercourse act; and, second, that it had been made because the owner was in armed rebellion against the United States.
All the cotton was sold by order of court pendente lite. By proceedings not necessary to consider, the proceeds of the cotton of other owners were separated from the proceeds of the claimant’s cotton, and were distributed by order of court.
On the 11th of September an amendment to the libel was allowed on motion of the district attorney. Though the amendment is loosely drawn, we think it operated to strike out the allegation that all the cotton was seized at Wilson Mitchell’s Landing •, an allegation which was evidently untrue
On the 4th of November, 1863, a decree was entered that one-half the proceeds of the cotton should be paid into the Treasury, and that the other half should be paid to Captain Pennock as informer. Both payments were made in accordance with the decree. Subsequently, much the larger part of the informer’s half found its way into the Treasury by proceedings which will be noticed hereafter.
The record of the proceedings in Illinois is loose and defective, but no more so than those which were sustained in the Confiscation Cases. (20 Wall., 92.) Most of the errors are identical with those which were put forward and overruled in that case. It is pressed upon us that the payment of half the proceeds to an informer was without warrant of law. Conceding this, the claimant cannot inquire into it in these proceedings if the district court had jurisdiction of the case. (Windsor v. McVeigh, 93 U. S., 274, and authorities cited in the opinion of the *41 court.) If tbe court bad no jurisdiction, tbe inquiry is unnecessary.
Some question was made at tbe trial as to tbe nature of these proceeding's. In our opinion tbe suit was begun and conducted under tbe provisions of tbe Confiscation act of July 17, 1862, Avitb pleading's in some respects identical, and in most respects similar, to tbe pleadings in tbe Confiscation Oases, wbicb are reported in tbe 20tb Wallace. It must therefore stand or fall by that act.
Tbe Attorney-General contends that tbe proceeds of tbe claimant’s cotton were duly confiscated in Illinois, and that tbe claimant is therefore debarred from pursuing them into tbe Treasury under the provisions of the Captured and Abandoned - Property Act.
Tbe claimant, on tbe other band, maintains that tbe provisions of tbe Captured and Abandoned Property Act are repugnant to tbe provisions of tbe Confiscation Acts; that tbe two cannot exist side by side; and that, consequently, tbe later repeals tbe earlier statutes.
Courts do not favor repeals of statutes by implication. Although subsequent laws cover some, or even all, tbe cases provided for by tbe prior statute, they may nevertheless be merely affirmative, cumulative, or auxiliary. In order to sustain a repeal by imylication, there must be a positive repugnancy between tbe provisions of tbe new law and those of tbe old (Wood v. United States, 16 Pet. 363) wbicb makes it absolutely impossible to reconcile tbe two. (McCool v. Smith, 1 Black, 471; see also Gillis’ Case, 95 U. S., 415, 416.) Especially, when there is a series of statutes on a subject, a court will endeavor to sustain tbe series as a whole (White v. Johnson, 23 Miss., 68 ; The State v. Mister, 5 Md., 11); and it will not regard tbe prior statutes as repealed by a later one by implication, unless tbe latter is either entirely inconsistent with tbe former or revises tbe whole subject matter and is evidently intended as a substitute for them. (Farr v. Brackett, 30 Vt., 344; .Giddings v. Cox, 31 Vt., 607; Longlois v. Longlois, 48 Ind., 60; Lewis v. Stone, 22 Wis., 234; New London R. R. Co. v. B. & A. R. R. Co., 102 Mass., 386.)
Tbe Confiscation Act of July, 1862, first made provisions for-tbe punishment of treason, wbicb are still in force. Then it required tbe President, after public warning, to seize tbe property of persons engaged in armed rebellion. It authorized proceed *42 ings in rem to be instituted against it after seizure for tbe purpose of condemnation and sale, and it directed tbe proceeds of tbe sale to be paid into tbe Treasury.
It was tbe evident purpose of Congress, as expressed in tbis legislation, that tbe property of disloyal enemies should be seized and sold through tbe instrumentality of tbe courts, and that tbe proceeds should pass into tbe Treasury.
Tbe Captured and Abandoned Property Act, however, contemplated tbe seizure, not only of tbe properties of disloyal persons but those of loyal persons as well in enemies’ country, and it created a new channel by which both might reach the Treasury. It further gave to a loyal owner who had never given aid or comfort to the rebellion the privilege of pursuing the proceeds of his cotton in this court; but as to a disloyal person, it increased the rigor of the law, by authorizing a new, rapid, and arbitrary mode of converting his property into a means for suppressing the rebellion, which recognized the title of the United States as absolute in it from the day of the seizure. It made no change in the disposition which the Confiscation Acts authorized the courts to make of that property. The privilege which a disloyal owner now enjoys comes to him from an executive act, which Congress attempted to set aside, and which would have been equally potent against an impending decree of confiscation.
A late and’carefully considered opinion of the Supreme Court justifies this conclusion. The court there says: “ In the indiscriminate seizure of private property, it seemed to Congress that friends might sometimes suffer. Therefore, to save them, it was provided that property when captured should be sold, and the proceeds paid into the Treasury of the Unjted States. * * As to all persons within the privileges of the act, the proceeds were to be held in trust, but as to all others the title ■of the United States was absolute.” (Collie's Case, 97 U. S., 39.)
It is clear that there is no conflict of priciple between the earlier and later acts. The repugnancy which is to force a court to the irresistible conclusion that the Confiscation Acts are repealed by implication is to be found (if at all) in that provision relating to the machinery for its execution whereby all cotton and other specified kinds of property in enemy’s country .are subjected to it.
The Confiscation Acts authorized the seizure of rebel prop *43 erty wherever found; the Captured and Abandoned Property Act only of certain kinds of property in the enemy’s country. The former contemplated the condemnation and sale only of the rebel’s interest in the property; the latter proceeded against the ■property itself, and put the absolute title to it in the state. The former, or at least the act of 1861, was a permanent measure; the latter was a temporary act, and expired with the rebellion. The former were repealed, if at all, on the passage of the new statute. The effective force of the latter against property was suspended until the Secretary of the Treasury should appoint agents to execute its provisions.
Thus it appears not only that the subject-matter and the duration of the earlier and of the later statutes are dissimilar, but also that the supposed date of the extinction of the former and the actual time when the latter became operative were not identical. It follows that conclusions drawn from the description of property affected by the act of 1863 are subject to serious modifications and exceptions, if we halt before the further conclusion that the new repiedy was cumulative and auxiliary.
The decisions of the Supreme Court in the Cotton Cases afford few glimpses of its leanings on this question. In only one. reported case of this class was an opportunity offered to the court to hold the Confiscation Acts repealed bjr the Abandoned and Captured Property Act. In Morris’s Case (8 Wall., 507) the proceedings were against cotton under the Confiscation Acts.. The monition was issued in May, 1866, and the decree of the court below, confiscating the cotton, was rendered December 20,1866. The court above reversed the decree on the ground of irregularity in the proceedings, and in an elaborate opinion took no notice 'of the present point, which would have been fatal to the judgment if taken. The decision is therefore authoritative only so far as silence, when opportune was offered the court to speak, is to be regarded as indicative of its views.
In Klein’s Case (13 Wall., 128) Mr. Chief Justice Chase called attention to the fact that no provision is made in the Captured and Abandoned Property Act for the confiscation of the property of disloyal owners, and added, that whether restoration would be ' made to those who had not continually adhered to the Government or confiscation would be enforced was left to be determined by considerations of public policy subsequently to be developed. If we may draw conclusions from such casual expressions, it is *44 not unreasonable to assume that tbe late learned Chief Justice was of opinion that the Confiscation Act was still in force and that its powers might be invoked.
Io Sprott’s Case (20 Wall., 459) Mr. Justice Field argued that the title of that claimant remained on the day of the delivery of. the property as perfect as it did the day the cotton was seized.,, because no proceedings under the Confiscation Acts had been instituted by the government for the condemnation and forfeiture of the cotton seized or its proceeds.
We are not insensible to the injustice of drawing positive conclusions from such isolated utterances. Every judge knows that expressions will creep into the most carefully prepared opinion which, when separated from their context, are capable of being-distorted to conclusions at variance with those entertained by their author. Making due allowance, however, these passages-in the reports are not without weight; and there are, in addition,, two late real-estate cases which may fairly be deemed to throw-more positive light on the views of the higher court.
The first is Semnes’s (Jase (91U. S., 21). He was the owner of certain real estate in Louisiana, against which proceedings for confiscation were instituted August 7,1803. The Captured and Abandoned Property Act did not at that time apply to real estate; but on the 2d July, 1804, it was extended by Congress so as to include all descriptions of property mentioned in the act of July 17, 1802, including real estate. About nine mouths after the passage of the act of 1804 the district court of Louisiana rendered judgment condemning Semmes’s property under the act of 1802. His real estate was sold under that judgment. The proceedings were brought before the Supreme Court and the judgment affirmed.
In the second case (Pike v. Wassel, 94 U. S. 711) lands in Arkansas were, on the 10th February, 1805, seized pursuant to instructions from the district attorney for the purpose of confiscation. On the 17th of that month they were libeled in the proper court, and on the 5th of the following April a decree of condemnation was entered, under which the lands were sold. On appeal the proceedings were sustained so far as they affected the interest of the then owner.
No question of jurisdiction was raised in these cases; but the court might have considered it of its own motion (Herriott v. Davis, 2 W. & M., 229). It is difficult to see how the judgments- *45 could have been rendered if the provisions of the act of July 17, 1862, affecting real estate, Avere repealed by the amendments made in 1864 to the act of March 12, 1863.
In view of all this, we cannot think that Congress intended in •every case to substitute the Captured and Abandoned Property Act, a statute limited in scope and temporary in duration, for the Confiscation Acts, with broader provisions and more enduring-life ; or that it designed, in the midst of war, to cut short all power of disposing of enemies’ property captured in the enemies’ country until an executive officer whom the Constitution clothes with no legislative functions should revive the power in another form.
Even if it were not a matter of history of which we may take judicial notice, the record in this ease would tell us under what circumstances the Captured and Abandoned Property Act was passed. The armies and fleets of the Government were in the heart of the insurgent country. Its wealth, so far as they penetrated, was within their grasp. Properties of friend and foe alike were held subject to the merciless rights of war. The statute, which has been well styled u liberal and beneficient legislalion” (Alexander’s Case, 2 Wall., 422), interposed its shield to save all from destruction or ravage; to lodge the property of friends where they might in more peaceful times seek its proceeds, and to give the Government the use of the wealth which its enemies would otherwise employ for its overthrow. The President’s power to seize, under the act of August, 1861, property employed in aiding, abetting, or promoting the insurrection, or, under the act of 1862, the properties of persons serving or holding office under the Confederate States or any of them, or any person in the loyal States who should give aid and comfort to the rebellion, or of persons in the disloyal States who should be actually engaged therein, was left unchecked by it; and no restraint was placed upon the subsequent proceedings authorized by those statutes for the condemnation and sale, as confiscated, of any properties which might be so seized under executive order.
Without such a previous seizure under an executive order, however, for the purpose of confiscation, no proceedings could be properly instituted under the Confiscation Act of July 17, 1862 (The Confiscation Cases, 20 Wall., 108); and as a district court of the United States is a court of limited jurisdiction, although not an inferior court (Thompson v. Lyle, 3 Watts & *46 Serg., 166), and as it must always appear in tlie record that it has jurisdiction of the particular case which it attempts to adjudicate (Exparte Smith, 04 U. S., 456), the record in any proceeding for confiscation must show an executive seizure of the property condemned before the court assumed jurisdiction over it (The Confiscation Oases, sup). If the fact snecessary to give the court jurisdiction do not appear in the record, its jurisdiction may be inquired into in every other court where the proceedings are relied upon and brought before the latter by a party claiming the benefit of them (Williamson v. Berry, 8 Pet., 540, cited with approval in Thompson v. Whitman, 18 Wall., 467).
In the present case no such executive order preceded the confiscation proceedings. The claimant’s cotton was seized by the naval forces of the United States under the general executive order of August 28,1862, for the purpose of naval defense. The Admiral in command reported the seizure, as required by the order, and was instructed by the Secretary of the Navy, on the 28th of March, to hold the cotton under the Abandoned and Captured Property Act. , This executive order struck at the root of the proceedings in Illinois; and when the district attorney libeled the cotton, he did not, because he could not, aver that it had been seized by executive order for the purpose of confiscation. The condemnation and sale under such a record are void, and for such portion of the claimant’s cotton as passed into the Treasury he is entitled to a judgment in this action, notwithstanding the judgment in Illinois.
We all agree that he is entitled to recover the moiety which the district court in Illinois decreed to be paid into the Treasury, and which was paid in after the passage of the Abandoned and Captured Property Act, notwithstanding the fact that the seizure of the cotton was made before the passage of that act. The decision as to the remainder is concurred in by only a majority of the court.
The suit in which the claimant’s cotton was condemned was one of many similar suits brought to judgment in the district court for the southern district of Illinois at that term, in all of' which Cairtain Pennock appeared as informer. In each of the suits a moiety of the proceeds was adjudged to him; and at the close of the term he received one check for $59,943.42, as representing the aggregate of the various sums so decreed to him. This identical check he handed to Admiral Porter as his supe *47 rior officer. Admiral Porter was unwilling to receive or keep it as an informer, and sent it to tlie Secretary of tlie Navy for distribution among tlie officers and crew of tlie Mississippi squadron as captors. Tlie Secretary of tlie Navy refused to so distribute it, and returned tlie same clieck to Admiral Porter. The Admiral then deposited the check with the assistant treasurer at Saint Louis, on whom it was drawn.
In July, 1874, proceedings were begun in the district court of the United States in the District of Columbia for the purpose of making such a distribution of said money among the officers and crew of the Mississippi squadron. These proceedings were instituted through Admiral Porter, who placed in the custody of the court his check upon the assistant treasurer at Saint Louis in favor of the assistant treasurer at Washington for the amount so deposited by him.
The district court of the District of Columbia took jurisdiction in admiralty of the res thus placed in its custody in a suit entitled “ The United States vs. $59,413.42, prize-money of the Mississippi squadron, deposited with the assistant treasurer, by order of the Secretary of the Navy, by Pear-Admiral David D. Porter, commanding Mississippi squadron.” It made three decrees on the 13th July, 1864.
By the first, it ordered the marshal to deposit the check with the assistant treasurer at Washington, and that the money therein, described should remain subject to the order of the court.
By the second, it recited that the money had been decreed to Admiral Porter, as informer, by the district court in Illinois, that the Admiral declined to receive it as informer, and desired it to be distributed as prize-money, and that it was subject to the payment of a certain amount of costs and disbursements, and it decreed that the residue, after payment of such costs and disbursements, should be distributed among the public vessels of the United States named in the decree.
By the third, it ordered the payment of said costs and disbursements, and that the residue of said money should be paid into the Treasury of the United States, to be distributed according to the terms of the decree passed by the court.
If these proceedings are to regarded as ancillary to the proceedings in Illinois for the purpose of correcting an assumed error of that court in failing to make a distribution of prize- *48 money they are void, not only because tbe court in Illinois itself would have been powerless to correct the supposed error after the expiration of the term in which the decree was rendered (The Lizzie Weston, Blatchf. Pr. Cas., 265, and authorities there cited), and because the original judgment to which it purported to be ancillary was itself void, but also because the Illinois suit was not in prize, but for the confiscation of enemies’ property. A suit for confiscation is an action of an entirely different nature from a proceeding in prize. Confiscation is the act of the sovereign against a rebellious subject. Condemnation as prize is the act of a belligerent against another belligerent. Confiscation may be effected by such means, either summary or arbitrary, as the sovereign, expressing its will through lawful channels, may please to adopt. Condemnation as prize can only be made in accordance with principles of law recognized in the common jurisprudence of the world. Both are proceedings in rein, but confiscation recognizes the title of the original owner to the property which is to be forfeited, while in prize the tenure of the property seized is qualified, provisional, and destitute of absolute ownership. (The Peterhoff, Blatchf. Pr. Cas., 620.) To confiscate property seized upon land, resort must be had to the common-law side of the court. (The Confiscation Cases, 20 Wall., 110.) Prize proceedings are always in admiralty.
If, on the other hand, they are to be regarded as independent proceedings, there must be statute authority to support them. Consent of parties will not confer on a district court a jurisdiction not given by statute (Railway Company v. Ramsay, 22 Wall., 322), especially where the rights of other parties are affected. The rights of the United States were involved by the decree of the district court of the District of Columbia as well as the rights of the claimants and of other owners of cotton condemned in Illinois. No one could acquire an interest in a prize except by the grant or permission of the United States (The Siren, 13 Wall., 393), or could take such right except in the manner authorized by law. The only authority found at that time for prize proceedings was contained in the act of July 17, 1862, for the better government of the Navy (12 Stat. L., 600; Alexander’s Case, 2 Wall., 422); and in the act of March 3, 1863, to regulate proceedings in prize cases (12 Stat. L., 759).
By the second section of the act for the better government of *49 tbe Navy, tbe United States granted to tbe officers and men in tbéir Navy, wbo should make maritime captures, a share in such as might be condemned as prize.
By tbe eleventh section of the act they directed that their own share in prizes should constitute a fund for the payment of naval pensions.
By the twelfth section, they directed the court which should have the custody of the res, or its proceeds,, when final condemnation should be made, to deposit the gross proceeds of the sale with the assistant treasurer of the United States at or nearest the place where the sale should be made; and by the act of Jdarch 3,1863, they made that deposit subject to the order of the court which was authorized to make payments and disbursements from it j and they further authorized the court to make final distribution of the residue after payment of the disburse-ments allowed by law, and required it to order such residue to be paid into the Treasury of the United States for distribution there according to the decree.
We are of opinion that no court is empowered to decree this final distribution except the court which first acquires jurisdiction over the res or its representative proceeds. We therefore think that the whole proceedings in Washington were not only void in themselves but void on their face, so as to afford no protection even to an innocent depositary without hire paying out money on the faith of them to a party not entitled to receive it.
The defendants, however, are not in the position of an innocent depositary without hire. Their agent carried away the claimant’s property, and they have undertaken that so much of its proceeds as the claimant can trace into the Treasury shall be repaid to him. ' (Haycraft’s Oase, 22 Wall., 81.) The suit which they authorized him to bring for the proceeds resembles the common-law action of indebitatus assumpsit — a liberal equitable action, which lies whenever a defendant becomes possessed of a plaintiff’s money, or of his property and converts it into money, and in the absence of some controlling rule of public policy or law cannot retain it with good conscience or without violating therules of natural justice and equity. We must treat the Government in such a suit precisely as a private person would be treated as defendant by a common-law court having jurisdiction of similar controversies between private parties.
The ministerial officer who pays the money under such a judg- *50 merit may or may not be protected, in the absence of fraud, as against the Government. Wo are not called upon to decide that question. But the payment does not protect the Government itself against the statutory obligation which it assumed to pay to an owner of captured property, no party to the judgment record, so much of the proceeds of his property as reached the Treasury. “In Sevier’s Case (7 C. Cls. R., 387) it was held that it is no part of our duty to inquire whether the fund in the Treasury is or is not exchanged, so long as the proper claimant to whom the promise was made is unpaid. That this decision was right is too clear for argument. The language of the third section of the act is explicit, that every claimant who establishes his right to judgment according to the provisions of that act is entitled to it, irrespective of the amount in the Treasury. It is for the political department of the Government to determine whether he shall have a further remedy in case nothing is in the Treasury to respond to a judgment.” (Burke's Case, 13 C. Cls. R., 240.)
It is further contended that this half of the proceeds of the claimant’s cotton lost its identity before the money which is claimed to be identical with it came into the Treasury. We do not think so. It was certainly paid to Captain Pennock; as certainly he paid it to Admiral Porter. From Admiral Porter it went to Secretary Welles; from Secretary Welles back again to Admiral Porter. By Admiral Porter it was macfe the subject of litigation in Washington and deposited with the court there. By the court it was ordered paid into the Treasury. In obedience to that order it was so paid. Every link in the chain is as clear as sunshine at noonday.
In our opinion the claimant has established everything which the law requires him to establish in order to be entitled to recover both the moiety of his cotton, amounting to $12,080.20, which was paid into the Treasury by order of the district court for the southern district of Illinois, and so much of the other moiety, amounting to $12,420.00, as was paid into the Treasury by order of the district court of the District of Columbia, making in all $25,100.80.
Judgment willbe entered accordingly.