OPINION.
Peelle, Ch. J.,
delivered the opinion of the court:
The question for decision arises on the defendants’ motion to dismiss the cause of action on the ground that section 14 of the act of March 3, 1887 (24 Stat. L., 505), under which the claim was referred, does not confer upon the court jurisdiction to consider claims arising prior to June 1, 1865, from seizure in hostile territory of cotton and other property under the abandoned and captured property act of March 12, 1863 (12 Stat. L., 820), and the amendatory act of July 2, 1864 (13 Stat. L., 375), though the cotton was sold and the proceeds thereof were paid into the Treasury. The bill referred is for the payment of a claim for the proceeds of cotton covered into the Treasury.
There is no contention that the claimant’s decedent herein was loyal to the United States during the whole or any part of the Civil War, nor is his loyalty alleged in the petition.
The claimant’s rights and remedy were created by the same statute, and in such cases the rule is that the remedy thus provided is exclusive of all others. (Haycraft v. United States, 22 Wall., 81, 98.) But that the remedy thus given in the Court of Claims was exclusive was declared by section 3 of the act of July 27, 1868 (15 Stat. L., 243, now Rev. Stat., sec. 1059, par. 4), in these words:
“ That the remedy given in cases of seizure under the said acts, by preferring claim in the Court of Claims, shall be ex- *563 elusive, precluding the owner of any property taken by agents of the Treasury Department as abandoned or captured property in virtue or under color of said acts from suit at common law, or any other mode of redress whatever, before any court other than said Court of Claims.”
The remedy there referred to for the proceeds of cotton covered into the Treasury was given by a provision in section 3 of said act of March 12, 1863, which reads:
* * * “And any person claiming to have been the owner of any such abandoned or captured property may, at any time within two years after the suppression of the rebellion, prefer his claim to the proceeds thereof in the Court of Claims; and on proof to the satisfaction of said court of his ownership of said property, of his right to the proceeds thereof, and that he has never given any aid or comfort to the present rebellion, to receive the residue of such proceeds, after the deduction of any purchase money which may have been paid, together with the expense of transportation and sale of said property, and any other lawful expenses attending the disposition thereof.”
Hence the remedy in cases of seizure is not only limited by the act of 1863 to the Court of Claims, but the subsequent statute prohibits any other mode of redress whatever before any other court, and such has been the uniform ruling both of the Supreme Court and of this court, Lamar v. McCulloch (115 U. S., 163) ; Ford v. United States (116 U. S., 213) ; and the Ford case in this court (19 C. Cls., 519), and the numerous authorities there cited.
The question therefore is, Has the court jurisdiction to find the facts respecting such claim under the act of March 3, 1887? Does the mere reference of the claim by one House of Congress operate to revive the claimant’s right to come into court and prosecute such a case after the jurisdictional period prescribed by the act has expired ?
Claims for the proceeds from the sale of cotton captured and covered into the Treasury have heretofore been referred to the court, first, in the case of Ford (19 C. Cls., 519), wherein a committee of Congress referred such claim under the act of March 3, 1883, known as the Bowman Act (22 Stat. L., 485), and which on motion of the Government *564 therefor was dismissed for want of jurisdiction under section 3 of said act. The court, however, went further in its ruling and, among other things, said:
“ We can not believe that it was the intention of Congress, in the Bowman Act, to reopen our doors to demands of this description. With regard to them the Bowman Act is silent, and its silence is as forcible as an express prohibition. It simply leaves that dead, as to the Government, which, when the act was passed, had been dead nearly fifteen years. * * *
“ The experience course tration of that act suggests to us some additional reasons for supposing that Congress did not intend by the Bowman Act to reopen this tribunal to abandoned and captured property claims.
“ The abandoned and captured property act was a to every man whose property had been captured and sold that he could follow its proceeds here, and, on making certain proofs, reclaim them. Is it not fairly presumable that if Congress intended to open this court again for such claims they would give now as clear and broad and universal notice of the fact as was given in 1868? Indeed, after so great a lapse of time would it not be unjust and unfair that any less notice should now be given than was then? We think it would; and we therefore decline to assume that the Bowman Act was intended to open a side door to this court, into which would come only such claimants as should happen to hear of it, and be able to get their claims referred to this court by a committee.
“Any such legislation as that would be entirely alien in spirit to the act of March 12, 1868, which gave to all loyal men an equal right and an equal chance to come here. We have had before us claims of all sizes, from that of a poor negro for a single bale of cotton to that of the rich man for thousands. If Congress should see fit to permit such claims to be again brought here, is it not reasonable to suppose that its legislation would be at least as unequivocal in terms and as enlarged in spirit as that of 1863 ?
Furthermore, a uncommon the abandoned and captured property act, was that conflicting claims to the same proceeds were presented by parties each of whom had sued here within the prescribed time. In such instances it was in the power of the court to hear all claims and adjudge all rights. But if one man may, under the Bowman Act, obtain a committee’s reference of his claim to this court, we must act on that claim alone and find and report the facts without any opportunity being offered to adverse claimants not informed of the proceedings to be heard *565 at all; and thus the real right of the matter might fail to be reached. If the fund is a trust, then every principle of equity and justice requires that everyone interested in the fund should have fair notice and full opportunity to assert and prove his rights, not only in his own favor but against all opposing claimants.”
What was there said when a like claim was pending before the court under the Bowman Act is equally true now under the Tucker Act. The proceeds covered into the Treasury, as ruled by the Supreme Court in Klein’s case (13 Wall., 136) and Intermingled Cotton cases (92 U. S., 653) were held in trust for those entitled thereto under the act; and as to those who having filed their claims within the jurisdictional period established their loyalty and ownership by a decree of this court,'such claims became a recognized legal liability against the United States. But, as was said b.y the court in Ford's case (19 C. Cls., 519, 525) respecting the right even of a loyal man in insurrectionary territory, “ he had no shadow of lawful claim against the Government before the act of March 12, 1863, was passed; nor had he after that, except as that act gave it to him.” So that in any event whatever right such claimant had to the proceeds arising from the sale of his cotton was given to him by the abandoned and captured property act, the determination of which was contingent upon his pursuing the remedy and establishing his loyalty and ownership' within the time and as in the act provided. This was the extent of the trust. (Young v. United States, 97 U. S., 39, 61.)
In the latter case the court, in speaking of the character of the fund in the Treasury, said: “As to all persons within the privileges of the act, the proceeds were held in trust, but as to all others the title of the United States as captor was absolute. Whoever could bring himself within the terms of the trust might sue the United States and recover, but no one else.” The time for that has passed, even for those who might otherwise have brought themselves within the trust. The jurisdictional period given by the act has ceased to be operative, and until revived or renewed no rights can be determined thereunder.
Congress may revive and renew the trust as well as the act and give to such claimants a renewed opportunity to have *566 their claims adjudicated This course has been pursued by Congress by special acts in some cases, as in that of Erwin (13 C. Cls., 49), which on appeal was affirmed (97 U. S., 392), in the case of Douglas (14 C. Cls., 1), and in the case of Briggs (25 C. Cls., 126), reversed (143 U. S., 346). In the last case the special act was passed in 1888 (25 Stat. L., 1075), after the Tucker Act, and Congress, nevertheless and notwithstanding the unconditional pardon granted by the proclamation of the President of December 25,1868 (15 Stat. L., 711), by an express proviso made loyalty a jurisdictional question.
As pardons thereby granted came after the period within which the claimants were permitted to file their claims under said act, the same did not avail them, as held in the case of Haycraft v. United States (22 Wall., 81), for the reason that the period within which such claims were to be presented was not one of limitation but of jurisdiction, and therefore the inability of an ,unpardoned owner to sue in the Court of Claims within such time could not extend the operation of the statute.
In the case of Webb v. United States (20 C. Cls., 487, 498) a like claim was referred by the United States Senate by resolution under Revised Statutes, section 1059, which looks to an adjudication; and while the court held that by virtue of the reference it had jurisdiction the demurrer to the petition was sustained on the ground that the facts averred did not constitute a cause of action; that the claim was not founded upon any legal right, and no new liability was created by the reference; and in respect thereto the court, among other things, said:
“ That the United States are not liable in any form for property seized or captured by the military authorities in time of war in enemy’s territory, or for the proceeds thereof in the Public Treasury, except as provided in the captured and abandoned property act, March 12, 1863 (ch. 120, 12 Stat. L., 820), has been decided by the Supreme Court in Klien’s case (13 Wall., 136), Haycraffs case (22 Wall., 81), The Intermingled Cotton cases (92 U. S. R., 653), Lamar's case (115 U. S., 163), and Young v. United States (97 U. S. R., 39, 58).”
*567 At page 500 the court further said:
“ The claimants did not prefer their claims to this court within two years after the suppression of the rebellion, and so are not of those who are entitled to the proceeds.
“ Congress has not yet declared any further general policy on the subject nor recognized the present claimants as entitled to such proceeds. The public policjr of the Government must be declared by Congress, and not by one House acting separately, or, as was said by the court in concluding its opinion in the Haycraft case, ‘ it is for .Congress, not the court, to determine whether this jurisdiction shall be extended and other remedies provided.’
“As to the balance,[1] $10,512,007.96, remaining in the Treasury from the proceeds of captured and abandoned property, as shown in Hodge's case {18 C. Cls. B., 704), whether restoration will be made to others or confiscation will be enforced still remains for the wisdom of Congress to determine, but it can not be done by one House alone referring isolated cases to this court.
“ When Congress determines to distribute that balance, it is to be presumed that provision will be made for a pro rata distribution among the numerous claimants who may come in with claims in the aggregate much more than sufficient to cover the whole balance, even if no more be presented than have appeared in cases dismissed by the court for the reason that they were not preferred within the'two years’ limitation.”
What was there said in 1885 is equally true now, and therefore unless section 14, act of 1887, operates to repeal the act of July 2,1868 (now par. 4, Bev. Stat., sec. 1059), or enlarges the claimant’s rights, the claimant is without any remedy or mode of redress in the courts whatever. Furthermore, under the reference by one House of Congress no new rights are given or revived under the act of March 12,1863.
That section 14 does not repeal or revive the act referred to seems clear; that is to,say, a provision which gives either House of Congress the right to refer a claim to the court can not be held to repeal a general statute or to revive a thereto *568 fore conferred right which is now barred. Repeals by implication, except in case of irreconcilable conflicts, are not favored, especially when the prior law, as in the present case, is a special act relating to a particular subject or class of claims and the subsequent act is general in its terms. (Petri v. Creelman Lumber Co., 109 U. S., 489, 499; Reed v. United States, 211 U. S., 529, 538; Ex Parte Grow Dog., 109 U. S., 570; and Vincent v. United States, 39 C. Cls., 456, 459.)
The last case was a claim growing out of an Indian depredation which was referred under the Tucker Act, and the court in relation thereto said:
“ The terms of the act of 1887, known as the Tucker Act, do not extend to the reference of claims as such by either House of Congress against Indian tribes or against the United States where the liability of the Government is dependent upon the acts of depredating Indians. Nor was it contemplated by that act that claims for such depredations should be referred to this court for findings of fact. Claims of this kind are provided for as claims by the jurisdictional act of March 3, 1891, and cases arising under that act can be disposed of only by following the directions of the statute investing this court with jurisdiction to hear and determine the same. Accordingly, we must hold that the court is now without jurisdiction to investigate and report the facts under the resolution which has placed the matter before us.”
That no claim of a legal or equitable character in the absence of legislation can be founded upon acts of war— recognized as belligerent — or acts done in the exercise of the war power to weaken the enemy, at least in hostile territory, requires no argument.
Nor can contractual rights arise between belligerent nations or between one of the belligerents and the citizens of the other, as when war begins the status of enemy attaches not only between the belligerent nations but between their respective citizens. Municipal law being silent in the country held by belligerents, the only law in force is that known as the law and usages of war on land. (Young v. United States, supra; Mrs. Alexander’s Cotton, 2 Wall., 404, 419. Moore’s Int. Law, vol. 7, p. 300 et seq.) Hence, whatever rights are given by one belligerent to the citizens of the other under such circumstances are by way of grace of the sovereign. *569 “ There can be no legal right against the authority that makes the law on which the right depends.” (Kawananakoa v. Polyblank, 205 U. S., 349-354.)
The cotton captured was, as said by Chief Justice Waite in Young v. United States, supra, at page 58—
“ a legitimate subject of capture by the national forces. We have many times so decided, and always without dissent. (Mrs. Alexander's Cotton, 2 Wall., 404; United States v. Padelford, 9 id., 531; Sprott v. United States, 20 id., 459; Hayeraft v. United States, 22 id., 81; Lamar v. Browne, 92 U. S., 187.) The authority for the capture was not derived from any particular act of Congress, but from the character of the property, it being £ potentially an auxiliary ! of the enemy, and constituting a means by which they hoped and expected to perpetuate their power.”
And quoting from Mrs. Alexander's ease, the court, among other things, said:
“ It is well known that cotton has constituted the chief reliance of the rebels for means to purchase the munitions of war in Europe. It is a matter of history that, rather than permit it to come into the possession of the national troops, the rebel government has everywhere devoted it, however owned, to destruction. The value of that destroyed at New Orleans just before its capture has been estimated at $80,000,000. The rebels regard it as one of their main sinews of war, and no principle of equity or just policy required, when the national occupation was itself precarious, that it should be spared from capture and allowed to remain, in case of the withdrawal of the Union troops, an element of strength to the rebellion.”
This being true, the cotton, upon capture and firm possession, became the absolute property of the United States. It was a recognized war asset of the Confederate Government; was publicly recited in their obligations and bonds as security for their payment, and when likely to fall into the hands of the Federal forces was authorized by the Confederate Congress to be destroyed. (Moore's Int. Lato, vol. 7, p. 304.) It Avas treated by the United States not only as enemy but as hostile property, without regard to the individual sentiments of the owners. (Ford v. Sarget, 97 U. S., 594-605; Prize cases, 2 Black, 635.)
*570 It was doubtless for these reasons that Congress in the exercise of their absolute power over the subject matter of these claims provided for them the exclusive remedy they did; and unless there can be found some language in subsequent acts looking to a revival of such remedy or repealing the act either in express terms or by necessary implication, the court is not at liberty to disregard the action of Congress so expressed.
The only office section 14 of the act of 1887 performs is the transmission by either House of Congress of a pending bill “ providing for the payment of a claim against the United States, legal or equitable, or for a grant, gift, or bounty,” and, therefore, where there has been legislation defining such claims, fixing the limit of the liability of the Government and the time within which they shall be prosecuted, the court must of necessity, in determining the facts respecting such claim, consider such statutes; otherwise there would be no basis for such claims.
In the case of Duplantier (27 C. Cls., 323, 325), which was a reference under the Bowman Act, the court referring to the limitations in that act, said:
“ The fact that a claim is referred by a committee of either House of Congress gives to it a sanction of jurisdiction, and it is only when it comes clearly within the inhibitions of the law that we refuse an investigation upon the merits. The court must with fidelity enforce the limitations of the law in a proceeding of this character, as well as in cases of its ordinary jurisdiction.”
What then are the limitations of the law which the court must enforce in the present case? • The question is not what equitable or moral grounds may move Congress to make appropriations, which alone rest with them (United States v. Realty Co., 163 U. S., 427, 444), but what power has Congress, by section 14 of the act of 1887, conferred upon the court respecting the present claim, which, if the owner was loyal, might have been prosecuted to judgment under the act exclusively provided therefor. Congress, by the act of 1863, limited the rights of loyal owners thereunder in the Court of Claims, and, by the act of 1868, declared that the remedy therein given in said court should be exclusive of all *571 others; so that claims for the proceeds of captured property under the act of 1863 and by reason thereof stand on a different basis even from those originating as acts of war.
We must, therefore, in respect of such claims, construe section 14 of the act of 1887 in the light of previous legislation and the decisions of the Supreme Court and of this court, in relation thereto (United States v. Pacific Railroad Co., 120 U. S., 227, 233; Ford v. Sarget, supra; Beasley's case, 21 C. Cls., 225; Heflebower's case, 21 C. Cls., 228; Myers's case, 22 C. Cls., 80; Conrad's case, 25 C. Cls., 443, and numerous other cases which need not be cited), as well as in harmony with the legislation and policy of Congress giving to the loyal owners of cotton, where the same was sold and the proceeds were covered into the Treasury, an exclusive remedy under the act of 1863. (Act July 4, 1864, sec. 1, 13 Stat. L., 381; Rev. Stats., sec. 1059, last proviso; sec. 3, act of Mar. 3, 1883, 22 Stat. L., 485; and other acts which might be cited.)
The same principle was applied by Congress in the Indian depredation act of March 3,1891 (26 Stat. L., 851), whereby claims of citizens for property taken or destroyed by Indians are excluded from the jurisdiction of the court unless at the time of the depredation the Indians were in amity with the United States.
Only one claim for the proceeds of abandoned and captured property where an opinion was rendered has been entertained by the court under a Tucker Act reference, and that was the case of Ghieves (42 C. Cls., 21), where tobacco had been seized and sold and the proceeds paid into the Treasury, though tobacco could not be classed as “ sinews of war ” or as “ potentially an auxiliary ” of the enemy. Tobacco seized by Sherman’s Army after the capture of Atlanta was issued to the troops as a supply, and the court has had several cases where tobacco had been seized and used by the troops, claim for which was referred to the court as a claim for stores and supplies; but, as said, the proceeds for the tobacco in the Ghieves case was covered into the Treasury, and we entertained jiirisdiction and found the facts, though the claimant was found not to have been loyal to the United States throughout the Civil War. That claim was certified to Congress and, as we are advised, is still pending there unpaid.
*572 The Bowman and Tucker Acts were intended to form one system having a common purpose, i. e., to afford assistance and relief to Congress and the executive departments in the investigation of claims and demands against the Government; not to disregard previous legislation or adjudications in relation to such cláims; and in the absence of language to the contrary there is no reason why the rules of law should not apply here as in other cases.
Nor is it any answer to say that the court should find the facts in every case referred, leaving to Congress the question of payment, as the court has first to determine the extent of its power or jurisdiction in the premises. “ Jurisdiction is not a matter of sympathy or favor. The courts are bound to take notice of the limits of their authority.” (Reid v. United States, 211 U. S., 529, 539.) Nor can the jurisdiction of the court be enlarged under the act by one House of Congress (.Sampson v.- United States, 42 C. Cls., 378) ; and if not clothed with authority to find the facts in such cases then the court should so report to Congress, leaving them to determine by further legislation whether they will empower the court to entertain jurisdiction in such cases, and if so .upon what basis.
And especially does this apply to the class of claims now under consideration; for if, as claimants contend, they are only .seeking the net proceeds of cotton covered into the Treasury, then under all the rules of equity and fair dealing those loyal owners claiming an interest therein should have notice and an opportunity to be heard and to share in the fund either upon the basis of the act of March 12, 1863, or under such other terms or conditions as Congress may prescribe.
Of the proceeds remaining in the Treasury amounting to $4,886,671 from cotton seized after June 30, 1865, the Secretary of the Treasury, allowed, under the act of May 18, 1872 (sec. 5, 17 Stat, L., 122, 184), $195,896.21, leaving $4,690,774.79, which the Secretary refused to return because the owners, he held, had sold the cotton to the Confederate Government, and the same was not, therefore, individual cotton when seized after June 30, 1865 (S. Ex. Doc. 23, p. 58, 43d Cong., 2d sess., and Ex. Doc. H. R, 45th Cong., 2d sess., *573 p. 36), but was tbe property of the Confederate Government. Therefore, as to the proceeds of the cotton thus seized after June 30, 1865, the claimants, it would appear, have had an opportunity to have their claims investigated by the Secretary of the Treasury, who disallowed them. But by the act approved March 3, 1911 (Public No. 475), to codify, revise, and amend the laws relating to the judiciary — to take effect, however, after January 1, 1912 — section 162 provides:
“ Sec. 162. The Court of Claims shall have jurisdiction to hear and determine claims of those whose property was taken subsequent to June the first, eighteen hundred and sixty-five, under the provisions of the act of Congress approved March twelfth, eighteen hundred and sixty-three, entitled ‘An act to provide for the collection of abandoned property and for the prevention of frauds in insurrectionary districts within the United States,’ and acts amendatory thereof where the property so taken was sold and the net proceeds thereof were placed in the Treasury of the United States; and the Secretary of the Treasury shall return said net proceeds to the owners thereof, on the judgment of said court, and full jurisdiction is given to said court to adjudge said claims, anj'-statutes of limitations to the contrary notwithstanding.”
Thus as to property captured, sold, and the proceeds paid into the Treasury subsequent to June 1,1865 — after the cessation of active hostilities — Congress have revived and applied the act of March 12,1863, and given the court jurisdiction to hear and determine such claims thereunder; but the jurisdiction so given does not extend to the present claim, shown by the petition to have originated from the capture and sale of cotton in 1863.
If Congress had desired the court to inquire into claims accruing prior to June 1, 1865, they had only to include them in the act of March 3, 1911, as they did those accruing subsequent thereto. The inaction of Congress in this respect is significant, as both classes of claims, respecting their right of reference under the Tucker Act, stood on equal terms.
When Congress concludes to pay such claims they will, as evidenced by the recent act, enact legislation to that end. The money arising from the proceeds of cotton in the Treasury can not be paid out without the consent of Congress. Hence no rights are lost by the action of the court; and in *574 the absence of some definite legislation authorizing the court to apportion the fund in the Treasury among the rightful claimants we are without authority to further proceed.
The views we have herein expressed as to the purpose and scope of the Tucker Act are not only in harmony with the legislation of Congress and the decisions to which we have referred, but are fully authorized by the recent amendment to said section 14 adding thereto the words “ together with such conclusions as shall be sufficient to inform Congress of the nature and character of the demand, either as a claim, legal or equitable, or as a gratuity, against the United States.” This we have done, and therefore the defendants’ motion to dismiss is sustained and the petition dismissed.
This opinion is ordered to be certified to Congress accordingly.

 The balance, as shown by report of the Register to the Secretary of the Treasury Feb. 4, 1888, was $4,992,349.92, and of the proceeds of cotton captured after June 30, 1865, as shown by report of the Secretary of the Treasury (S. Ex. Doe. 23, p. 58, 43d Cong., 2d sess.), a balanee.of $4,690,774.79, which the Secretary reported from his investigation under the act of 1872 (17 Stat. L., 122, 134, sec. 5), therein referred to, was not individual cotton, but property of the Confederate Government (Ex. Doe. H. R., 45th Cong., 2d sess,, p. 36).