Lorino. J.,
delivered tbe opinion of the court:
The third section of the act of 12th March, 1803, entitles a claimant of captured and abandoned property to recover, oh proof of his “ ownership? and his * right to the proceeds.”
These words, 11 ownership” and 11 right to the proceeds,” are not technical words, and in their ordinary meaning they include all'property and rights of property which may be available for pecuniary benefit. And it is manifest that ownership or property may exist in one person and rights in it in another, both at common law and in equity; for a vendee may have the right of property in the thing sold, while the vendor has the possession and therewith a lien on the thing sold for its price. And where, at the time of the capture or seizure of the property by the United States, this state of things existed by force of a contract, the performance of which the seizure prevented, the respective rights of the parties under the contract can be administered only by carrying out the contract by its specific performance, and giving to each of the different claimants the benefit which the contract would have secured to him.
And the Supreme Court has decided that under the third section, of the act of 12th March, 1863, the Government are trustees for loyal owners for the net proceeds of abandoned or captured property in the Treasury. And if the statute perse, or together with any other legislation, makes the Government trustees, it makes the claimants cestuis que trust; and it imposes on the Government the duties of trustees; and gives to claimants the rights and beneficial interests of cestuis que trust. And it empowers this court to administer and enforce such duties and such rights, because the administration of the statute is placed here'. - ’
As has been said, the cotton in question here was raised on the plantation of Mr. J. K. Elgee, and is claimed by his executrix, Bessie Elgee Gansen, as part of his estate at his death.
Charles S. Lobdell claims under a contract of sale dated July 31,1863, and made between him. and Elgee & Chambers, by their agent Gordon.
Mrs. Julia Nutt, executrix of Haller Nutt, claims under a contract of sale made in October, 1863, between him, through his agent, P. Holmes, and Mr. Elgee.
O. Y. Woodruff & Go. claim as the vendees of O. S. Lobdell, *614 on a contract of sale made by bis agent, V. Hebert, to them, on the 15th of March, 1864, and under assignments by Lobdell of his contract with Elgee & Chambers, made on May 3, 1864.
The United States assert no title in their own right, and the only question for them is the respective titles of the several claimants. And the title to be first considered is that of the first vendee, C. S. Lobdell.
It rests on the contract made between him and Elgee & Chambers, which is as follows:
“Mississippi, Wilkinson County:
“ We have, this 31st of July, 1863, sold unto Mr. C. S. Lob-dell our crops of cotton, now lying in the county aforesaid, numbering about 2,100 bales, at the price of 10 cents per pound, currency, the said cotton to be delivered at the landing of Fort Adams, and to be paid for when weighed, Mr. Lobdell agreeing to furnish, at his cost, the bagging, rope, and twine necessary to bale the cotton unginned, and we do acknowledge to have received, in order to confirm this contract, the sum of $30. This cotton will be received and shipped by the house of Dasilva & Co., New Orleans, and from this date is at the risk of Mr. Lobdell. This cotton is said to have weighed an average of five hundred pounds when baled.
“W. C. GORDON,

u Agent for Elgee t& Chambers.

“C. S. LOBDELL.”
[Stamp.]
“ I hereby transfer all of my right, title, and interest to the within contract to Messrs. Woodruff', of the city of New Orleans.
“ C. S. LOBDELL.
“ Mat 3,1864.”
• [Stamp.]
C. Y. Woodruff & Co. claim that this contract from its date vested the property in Lobdell. The other claimants deny this, and contend that the contract wa.s executory only because the cotton was to be weighed by the parties at Fort Adams, where it was to be delivered to Lobdell and paid for.
But the-weighing was only to ascertain the amount of the *615 whole price at the rate fixed, and was therefore immaterial to the vesting of the property.
In the common law of England the sale of a personal chattel is the transfer of its ownership for a price, and that ownership is made tip of two rights, viz, the right of property and the right of possession, and these rights are so distinct that they pass by different means and at different times, and in every sale they are in different persons at the same time. The right of property passes first, and by the mere agreement of the parties in the contract of sale. The light of possession passes afterward, and by delivery of the thing sold, or payment.
Where the subject of the sale is a single thing, and thus specific in itself, like a horse or a ship, the right of property, in it passes.by the mere agreement of sale, because nothing remains to be done between the parties to ascertain. the thing sold, and their assent in that appropriates it to the contract, and it is bound by it. But where the subject of the sale is not in itself specific, as where it is a part of a quantity, as 100 bushels of a larger quantity of wheat, there the subject of the sale is not ascertained between the parties till it is measured off and separated from the rest, and thus made specific-in itself, and till then the property in it does not pass.
But where the whole of a quantity is the subject of the sale, as a stack of hay, or all the wheat in a certain store, there the thing sold is specific in itself, and the property passes on the agreement of sale exactly as in the case of a horse or a ship ; and if the whole quantity of wheat is sold for £6 per hundred weight, it has to be'weighed to ascertain the price, but that does not alter the fact that the thing sold, the whole of the quantity, is specific, and therefore does not affect the application of the rule as to the sale of specific chattels. In suoli case, therefore, the weighing is immaterial to the spéeification of the property, and hence the rule that where the weighing is necessary to make the Subject of the sale specific, i. e., to ascertain the thing sold, there the property does not pass till after the weighing. But where the weighing is only to ascertain the price of the thing sold, the property pa'sses before the weighing, and without regard to it.
This has been made very distinct in American law. In the case of Crofoot v. Bennett, Strong, J., said: u If the goods sold are clearly identified, then, although it may be necessary to *616 number, weigh, or measure them in order to ascertain what would be the price of the whole at a rate agreed upon between the parties, the title will pass. If a flock of sheep is sold at so much a head, and it is agreed that they shall be counted after the sale in order to determine the entire price of the whole, the sale is valid and complete. But if a given number out of the whole are sold, no title is acquired by the purchaser until they are separated and their identity is thus ascertained and determined. The distinction in all these cases does not depend so much on what is to be done, as upon the object which is to be effectedbyit. If that is specification, the property is not changed 5 if is merely to ascertain the total value at designated rates, the change of title is effected/ (2 Comstock, N. Y. K., 258.)
All the propositions above stated or cited are but the direct consequences of the elementary principle of the common law that the ownership of a chattel is made up of the right of property and the right of possession, and that the former passes on the agreement of sale where the thing sold is specific in itself and thus ascertained between the parties. And as the whole of a quantity is a single thing, and thus specific in itself, to say that the property in it does not pass till the price of it is ascertained by weighing or measuring, is to set aside the rule of the 'common law, and to substitute for it the rule of the civil law which rests on reasons belonging to that law, and which do nob belong to the common law; and such a departure from the ancient rule of the common law was begun in England as late as 1805, in the case of Hanson v. Meyer, in the time of Lord Ellenborougli, and that case was followed by a series of eases, many of which have been cited to us, which established for a time the rule in English practice “ that where anything remains to be done to the goods for the purpose of ascertaining the price, as by measuring, weighing, or testing the goods, where the price is to depend' on the quantity or quality of the goods, the performance of these things * * * shall be a condition-precedent to the transfer of the property, although the individual goods be ascertained and they are in the state in which they ought to be accepted’/ (Blackburn on Sales, 152.)
Mr. Blackburn, after stating this rule in his treatise on sales, says that of it “ there is no trace in the reports before the time of Lord Ellenborough/ and adds: “It seems to be some■what hastily adopted from the civil law without adverting to *617 tlie great distinction made by tlie civilians between a sale for a certain price in money and an exchange for anything else. The English law makes no such distinction, but, as it seems, has adopted the rule of the civil law, which seems to have no foundation, except in that distinction. * * * While the price remains unascertained, the sale is clearly not for a certain sum of money, and, therefore, does not come within the civilian’s definition of a perfect sale, transferring the risk and gain of the thing sold; but the English law does not require that the consideration for a bargain and sale should be money numbered, provided it be of value. Still, both branches of the rule seem to be now firmly established as English law, though; as has been already stated, only within the last half century, and then it seems directly adopted from the civil law.” (Blackburn on Sales, 151.)
And the learned author then refers to the text of Pothier as having furnished not only the ideas, but the very language, of the English judges.
To the remarks of Mr. Blackburn may be added the broader distinction between the civil and the common law, viz, that the ¡ terms of a sale of a chattel in the civil law transfer only the possession and a guarantee of that, and, in the words of Pothier, “ they do not, in strictness, import an obligation to transfer the; property,” while in the English law the first element of a sale; is the transfer of the property itself in the thing sold. So that,; in fact, the English courts applied the rule they borrowed from | the civil law to a subject not contemplated by that law.
But the modern English cases seem tending back practically to the rule of the common law, by resting their decisions on the intent of the parties as shown by their contract, and all the circumstances of the particular case, instead of upon any conventional rule of construction. Thus, in Turley v. Bates, 2 Hurlstone & Coltman, 1863, the sale was of an entire heap of fire-clay, at 2s. per ton; the buyer was to cart it away and weigh it; he weighed, removed, and paid for a part, and refused to weigh and take the rest. In a suit by the seller for the .price of that not weighed nor taken away, the -jury found that the sale was for the whole heap. And the court held that on this finding the property in the whole heap had passed to the buyer, and that he was liable for the price sued for. In this case all the authorities establishing the rule that where the price was to be *618 ascertained by weighing, that was necessary to change the property, and the comments of Mr. Blackburn on the rule-were considered, and the decision was rested on the intent of the parties as manifested by the facts found by the jury.
And in the subsequent case of Kershard v. Ogden, 3 Hurlstone & Coltman, 717, in 1865, the facts found by the jury were, that the defendants purchased four specific stacks of cotton-waste at Is. 9cl. per pound; the defendants were to send their own packer and carts to remove it when weighed; a part was weighed and taken away, the rest was not weighed nor taken; for this residue the suit was brought. Martin, J., said : “The question depends on what was the contract; the jury have found it was a contract to buy four stacks of cotton-waste specifically agreed on, more or less, taking them for better or worse.” And the court held that the property in the four stacks had passed to the buyer, and he was liable for the price of the whole.
We have cited these English authorities to show that the rule in question was no part of the common law, but conflicts with its elementary principles, and was ingrafted on it from the civil law by modern authority, which is gradually wearing away. This authority has prevailed more or less in this country, but we think the better conclusion from the common law is that where the weighing or measuring is only to ascertain the price of an entire quantity sold it is immaterial to the change of property.
In this case the thing sold was specific, for it was the whole of a quantity. The words of description are u our crops of cotton now lying in the county aforesaid.” A crop is a season’s product cut off or gathered. And the contract thus specifies the gathered cotton of the vendors lying in Wilkinson County. And the weighing provided for was only to ascertain the aggregate price at 10 cents per pound.
It is also observable that by the contract, and to fix the price of the cotton between the parties in case of its destruction before weighing at Fort Adams, it was agreed between them that its weight was 500 pounds per bale. And this agreement is equivalent to weighing, so far as that could affect the vesting of the property in the vendee; for it served, and was intended by the parties to serve, the same purpose as weighing and to be a substitute for it.
In this case a part of the cotton was not baled when the *619 contract was made, and by the contract it was to be baled by the seller with, bagging, ropes, and twine, to be famished by the buyer; and it was contended that this made the sale executory by the rule, which is thus stated in the text-books: “ Where, by the agreement, the vendor is.to do anything to the goods for the purpose of putting them in.to that state in which the purchaser is to be bound to accept them, the performance of these things shall (in the absence of circumstances indicating a contrary intention) be taken to be a condition-precedent to the vesting of the property.” This rule, Mr. Blackburn says, “ seems to be founded in reason,” and it is not to be questioned. But it is to be applied with its qualification, (viz, in the absence of circumstances indicating a contrary intention,) and .it is to be recollected that this and the rule previously considered are but rules of construction, and, as such, only means of ascertaining the intent of the parties, which is, in itself, the reason for. decision in every case.
In Young v. Matthews, 2 L. R.., C. B., 127, 1862, the contract was for a quantity of bricks in a brick-yard — some of them were burned, some burning, and some only pressed. The court inferred the intent that the property should pass immediately, from circumstances in evidence, and held that it did, and said: “It depends on the intention of the.parties whether the property of the goods, to which something remains to be done before they are ready to be delivered, passes to the buyer at the time of the sale or on the completion of the goods.” And this conforms to the text of Mr. Blackburn, who says,"p. 160: “ If, however, it appears from the agreement that the intention of the parties is that the property shall pass presently, the property does pass, though there' remain acts to be done by the vendor before the goods are, deliverable.” And the reason is that the rules of construction stated are but means of ascei\ tabling the intent of the parties which the court is to carry into execution as the contract between them. And if the parties have plainly declared their intent in words, the rules formed for ascertaining their intent are not needed. And they cannot be used to-contradict the words of the parties, and to trammel and defeat the purpose for which they were made.
Now, the intent of the parties as to the passing of the property by the sale can in no way be so clearly manifested as by their written declaration, that from its date the property shall *620 belong fco the ventlee, and any paraphrase of that will have the same effect; and'in this case the written contract says in terms that the property “ from this date is at the rish of Mr. Lobdell,” and in the nature of things, and by the rule of law, the risk follows the property, as the effect its cause. Hence the maxim, “ res perit suo domino.” It may be true, as argued at the bar, that this maxim is generally used to determine where a loss shall fall, when the ownership has been fixed by evidence, and thus to express the legal consequence of ownership. But the inference from effect to cause is as direct and logical as from cause to effect, and if the risk is the distinctive consequence of ownership, it is necessarily the evidence of it.
And we think that on the construction of the contract the property in the cotton was from the date of the contract vested absolutely in Mr. Lobdell, although it had to be weighed to ascertain the price, and a part to be baled by the vendor to be made deliverable, and although the whole was to-remain in the vendor’s possession till paid for.
The decision thus reached is on the contract between Elgee & Chambers and Lobdell, and decides only the rights of those parties in relation to each other. And the reasons of our decision are that the subject of the contract was specific ascertained, goods ; and that the contract and the evidence show that it was the intention of the parties that from the date of the contract the property in the goods should vest in the vendee, and the possession of the goods remain in the vendors, with a lien on them for the price. And the rule in such cases is thus stated by Mr. Benjamin, who says: “In Gilmour v. Sapple, 11 Moore, P. C., 566, 185S, Sir Cresswell Cresswell, in giving an elaborate judgment of the Privy Council, says: “By the law of England, by a contract for the sale of specific ascertained goods, the property ini mediately vests in the buyer and a right to the price in the seller, unless it can be shown that such was not the intention of the parties.” And in the Calcutta Company v. De Maltas, (32 L. P., 2 B., 222, 228,) in 1863, Blackburn, J., pronounced .this to be “ a very accurate statement of the law.” (Benjamin on Sales, 220.)
MRS. NUTT’S CLAIM.
The contract made by Elgee with Holmes as Dr. Nutt’s agent was made in the presence and with the assent of Chambers, so that no question as to him embarrasses this case.
*621 Mrs. Nutt, as executrix of Dr. Nutt, claims under a sale made in October, 1863, and to establish this against'the title we have adjudged to Lobdell, under his contract of July 31, 1863, she must show a possession by her intestate; for the rule of law is, that if the same thing is sold by the vendor to two parties by contracts equally valid, he who first gets possession will hold it. But. such possession is essential to the title of the subsequent purchaser, for, if neither of two purchasers gets possession, and both rest on contracts equally valid, the rule is necessarily, li Qui prior est tempore potior est jure,” for there is no other rule for measuring their respective rights or equities.
And Mrs. Nutt claims that the contract with her intestate was executed, and vested the property in him, and that he had possession.
The contract between Elgee and Holmes was made in October, 1863, and was for the sale of as many of the twenty-one hundred bales of cotton as Holmes should get out in safety to a market, and for the bales so got out Holmes was to pay £15 per bale in Liverpool; and till the cotton ivas got out the risk of it was to be on Elgee.
This conlract was merely executory, for the risk of the twenty-one hundred bales was to remain in Elgee after the contract, and, for the reasons above stated, if Elgee retained the property; and that did not pass to the vendee. Besides the subject of the sale, the very thing sold was not ascertained or made specific, for Dr. Nutt,was to buy and pay for only the bales got out, and how many, and which these might be was not known, and until this was ascertained and determined there was not and could not be any specification or ascertainment of the thing sold, or any transfer of the property in it, nor any ascertainment of the price to be paid.
It has been stated that a letter was written by Elgee to ■ Holmes, and that letter was as follows:
“ Alexandria, October 8,1863.
“ Dear Sir : It having been agreed on between you and myself that I sell to you all the cotton of Elgee & Chambers now baled and under shed, for the price of 15 pounds sterling per bale, payable in Liverpool, you will cause the same to be placed to my credit with James A. Jackson & Co., of Liverpoql.
“Yours,
“J. K. ELGEE.
“ Captain Truman Holmes, Present
*622 It was contended on belialf of Mrs. Nutt that this letter was a bill of sale, and with its exhibition to Gordon, amounted to a sale and notice to the keeper of the property, and his acceptance of such notice, and was thus in legal effect a delivery.
But it certainly was not a delivery to change the property in the 2,100 bales, and was not so intended between the parties, because, by the agreement between them, the risk of the 2,100 bales remained in Blgee, and Dr. Nutt was not bound to pay the price for all these.
Moreover, the letter from Blgee to Holmes was nót a bill of sale, and does not purport to be, but is apparently a mere direction where to pay the money that might become due. It was a memorandum of sale that might satisfy the statute of frauds, but nothing more.
And it was not addressed to-Gordon, and was not an order to him to hold the property for Holmes, and gave to Gordon no authority to do so. It was not, therefore, like an order from a seller to a warehouse-man, and had no such effect.
It has been stated that Gordon indorsed on the letter from Elgee to Holmes a ratification of their contract under the circumstances stated above. And that ratification was in these words:
“Having been notified by Mr. J. K. Elgee^óf the sale-of the within cotton to Mr. T. C. Holmes, I hereby ratify and confirm the same, as agent for Elgee & Chambers.
“W. O. GOBDON.
“ Captain Holmes.
But Gordon had no authority from Elgee or Chambers, or either of them, to make such indorsement or ratification, and was not their agent for any such purpose. And, waiving all question as to authority and the circumstances under which the indorsement was made, Gordon could only ratify the executory contract already made by Elgee, and did not pretend or assume to alter the terms of that contract.
It was contended that Holmes notified Gordon of the sale from Elgee, and employed Gordon to take charge of the cotton, and that Gordon agreed to do so, and thus attorned to him for the property, and that this was in legal effect a delivery from Elgee to Dr. Nutt. If the facts stated were found by the court, they would be immaterial, because no authority from Elgee to *623 Gordon for all this is shown, and without it Gordon could not, by any agreement with Holmes, alter-his contract with Elgee,' or make that executory an executed contract of sale. And if Gordon had in fact delivered the cotton to Holmes in October, 1863, on Felter’s plantation, it could have been, in legal effect, only a delivery under and according to the contract between Elgee and Holmes, not to pass the property, but only to enable Holmes to get out the cotton, which would have remained at Elgee’s risk, and therefore his property, till got out.
But the facts stated are-not found by the court. On the other hand, the court find that after the negotiation between Elgee and Holmes, the former, stating to Gordon that he had not heard from Holmes for two months, desired him to tell Holmes that the negotiation made between him and Elgee was at an end; and this Gordon did; and on the findings of the court this was all that Gordon, as the agent of Elgee, did with Holmes as the agent of Dr. Nutt.
For these reasons we hold that the contract between Elgee and Dr. Nutt was executory only, so that thereby no property in the cotton passed to Dr. Nutt; and that there was no delivery to him of the cotton, actual or constructive, so that he has not the rights of a subsequent purchaser, to which delivery is essential. The seizure of the cotton divested nothing from him, for all he had was a personal contract with Elgee, and his representatives have that now.
We thiuk, therefore, that Mrs. Nutt has no position or right which enables her to impugn the sale to Lobdell, which was prior to the contract with' her testator, and that she has no claim to the proceeds of the cotton in the Treasury.
There is another objection to the claim of Mrs. Nutt. At the time of the contract Dr. Nutt was a resident within the lines of the Union forces holding Natchez, and obtained from its military authorities permits for his agents to pass out of those lines into the confederates’ territory, where the contract was made with Elgee, then disloyal. A.majority of the court think that this was a violation of the non-intercourse acts avoiding the contract.
TITLE OE O. V. woodruee & 00.
C. V. Woodruff & Co. claim on their contract with Lobdell, which is as follows:
*624 “ Few ORLEANS, March 15, 1864.
“This contract, made this 15th day of March, 1864, between 0. S. Lobdell, of the parish of West Baton Rouge, in the State of Louisiana, and C. Y. Woodruff & Co., of the city of New Orleans, witnesses: That Mr. 0. S. Lobdell has sold this day to C. Y. Woodruff & Co. a certain contract, of which he is the owner and possessor, for the delivery of two thousand one hundred bales of cotton sold to the said Lobdell by Elgee & Chambers, by their agent, W. 0. Gordon, of the county of Wilkinson, in, the State of Mississippi, as will appear by reference to said contract; and the said 0. Y. Woodruff & Co., of New Orleans aforesaid, hereby agree to pay to Mr. W. 0. Gordon, the agent of Messrs. Elgee & Chambers, at the time of receiving said'cotton, the sum of one hundred thousand dollars, or ten cents per pound currency; and in case of not being able from any cause to pay said Gordon, then said C. Y. Woodruff & Co. agree to pay said sum of one hundred thousand dollars, or ten cents per pound, to Mr. Yictor Hebert, of No. 47 Common street, New Orleans, for account of said Elgee & Chambers, and also to pay over to said Hebert the further sum of two hundred thousand dollars, or the sum of twenty cents per pound,' currency,’ for account of the said 0. S. Lobdell; and in case the quantity of cotton should fall short, then there shall be paid ten cents per pound for account of said Elgee & Chambers, and twenty cents per pound for account of said 0. S. Lobdell, for such amount or quantity of cotton as shall be received from said Elgee & Chambers; and it is understood by both of these contracting parties that this cotton belongs to Mr. Lobdell until the consideration of thirty cents per pound upon the cotton shall be paid, viz, ten cents per pound to or for account of Elgee & Chambers, and twenty cents to or for account of sa.id Lobdell, as aforesaid.
“Y. HEBERT,

‘■Mr G. 8. Lobdell.

“0. Y. WOODRUFF & CO.”
The contract expressly provides that the cotton belongs to Lobdell until the consideration of 30 cents per pound on the cotton shall be paid, viz, 10 cents per pound to or for account of Elgee & Chambers, and 20 cents to or for account of said Lobdell. This is the express declaration of the parties, that *625 Lobdell is to retain the property in the cotton till it was paid for, and the reason is manifest that, as the cotton was not in Lobdell’s possession, the only security he had for the price was the retention of the property and the rights of owner till he got the price. Besides, Woodruff & Co. were not to pay for the 2,100 bales, but only for so many of them as were received from Blgee & Chambers, and till that was determined there was no specification of the thing sold or the price to be. paid.
It was claimed for Woodruff & Co., that the two assignments made by Lobdell to them on May 3, 1864, vested in them all-the rights of Lobdell under the contract assigned, and among them the property in the cotton.
Those writing’s are both made the same day. One is written under the contract between Lobdell & Co. and Woodruff & Go., and is as follows:
H For the purpose of instituting suit I have transferred the contract for the Blgee and Chambers cotton referred to above. The contract above is still in full force and effect. -
“ C. S. LOBDBLL.
“ C. Y. WOODRUFF & CO.
“ May 3, 1864.”
The other writing is indorsed on the contract between Elgee & Chambers and Lobdell, and is as follows :
“ I hereby transfer all my right, title, and interest to the within contract to Messrs. Woodruff & Co., of the city of New Orleans.
“ C.. S. LOBDELL.
“ May 3,1864.”
The latter writing is an assignment, the purpose of which is shown in the former, and they show that they were made for a special purpose, viz, to authorize C. V. Woodruff & Co. to prosecute for the benefit of Lobdell his rights under the contracts shown, and we think they have no further effect.
The evidence shows that Lobdell, after the sale to him, employed Morris to watch and protect the cotton, and paid him for so doing, and that, after Lobdell contracted with Woodruff & Co., Morris continued for them the same care of the cotton that he had exercised for Lobdell. But this custody by Morris ibr O. Y. Woodruff & Co. was not by any authority from Lob-dell, and was not- a-delivery from him changing the property in the cotton ; for the possession remained in Blgee & Cham *626 bers by Gordon to preserve their lien for the price,-and Lobdell had no right or power to make a delivery discharging that lien or the possession requisite for it; and the contract between Lobdell and Woodruff & Co. expressly declares that the cotton shall belong to Lobdell till the price is paid. And the parties to this contract could not have intended that Morris’s custody of the cotton should defeat'their express agreement.
And this contract was made.in New Orleans, where it was to be executed, and where both parties resided. The contract is, therefore, governed by the laws of Louisiana, and by those laws, which are fashioned on the civil law, where' the price of goods sold (whether the whole or a part of a quantity) is to be ascertained by weighing, the property is not changed till the weighing is done and the price thereby ascertained, unless the parties have expressly or impliedly manifested a different intent. (Goodwin v. Pritchard, 10 L. & B., 249.) And here the rule of the code is declared to be the intent of the parties and made an express term of their contract.
For the reasons above stated we hold that the sale to Wood-ruff & Co. was executory only, and vested in them no property in the cotton.
JBut the seizure ot the cotton by the United States made the delivery of the cotton under the contract impossible, and vested it in the United States as trustees for those having any beneficial interest in it under any legal contract. And, as has been said, the contract is governed by the laws of Louisiana, and by those laws Woodruff & (Jo. were entitled to a specific performance of the contract. (C. 0., articles 1920, 2433.) They had, therefore, by these laws an interest in the cotton itself, the jus in re, which is quasi property; and the United States held the cotton charged with that obligation of specific performance to which it -was subject when seized.
And that specific performance is to be carried out as follows: Gross proceeds.; $381,428 27
Deductions:
Freight, &c. $45,349 12
Legal expenses.- - - 16,000 00
Camp & Smith... 45, 000 00
106,349 12
275, 079 15 Net proceeds
*627 Interest on bonds.. $91, 091 68
Amount to be divided. 366,170 83
To Elgee’s executrix:
1,528 bales, 500 pounds each, at 10 cents per pound. $76,400 00
572 bales, 271,818 pounds, 10 cents per pound . .. 27,181 80
103, 581 80
Proportion of interest. 34,300 82
$137, 882 62
To Lobdell:
572 bales, 271,818 pounds, at 20 cents per pound. 54,363 60
Proportion of interest. 18,002 35
72,365 95
To C. Y. Woodruff & Oo.:
Balance of net proceeds. 117,133 75
Balance of interest. 38, 788 51
155, 922 26
366,170 83
And a decree will be made accordingly.