122 U.S. 611
 7 S.Ct. 1377
 30 L.Ed. 793
 RICE
v.
UNITED STATES.
 March 7, 1887.
 
 (Decision by a divided court.)
 The facts sufficiently appear from the following petition, which was filed February 17, 1886, and from the opinion of the court of claims, set out below.
 'To the Honorable, the Court of Claims:
 'The claimant, Lepine C. Rice, a citizen of the United States, resident in the city of Savannah, in the state of Georgia, respectfully represents:
 '(1) Under the provisions of Rev. St. U. S. tit. 'Bankruptcy,' he is the duly appointed and qualified assignee of Robert Erwin and Charles S. Hardee, late partners trading as Erwin & Hardee, in the said city of Savannah, as appears more fuly from certified copies of the adjudication of bankruptcy, and of the order making his appointment, herewith filed, marked, respectively, 'Claimant's Exhibit L. C. R. No. 1,' and 'L. C. R. No. 2,' and as such assignee he now brings this suit for the benefit of the trust so reposed in him.
 '(2) The said Robert Erwin, then a citizen of the state of Georgia, on the twenty-first day of December, 1864, was the exclusive owner, in his own right, of two hundred and eighty-three (283) bales of upland cotton stored in the said city of Savannah, which on or about that day was seized and captured by persons duly authorized and acting in behalf of the United States, and the proceeds of the sale made thereof, amounting, as is believed and it is here charged, to the net sum of forty-nine thousand six hundred and eighteen dollars and thirty-nine cents, ($49,618.39,) were paid into the treasury of the United States, pursuant to the provisions of the act of congress approved March 12, 1863, c. 120, commonly called the 'Captured and Abandoned Property Act.' And on or about the first day of July, 1865, he was also the owner, exclusively and in his own right, of another lot of two hundred and sixty-one (261) bales of sea-island cotton then stored at and in the warehouse of Evans & Parnell, in the town of Thomasville, in said state of Georgia, which on or about that day was also so seized and captured by persons duly authorized and acting in behalf of the United States, was removed to and stored at the government cotton-press in the city of Savannah, where it remained in the custody of said agents of the United States until in the month of August following, when it was by them forwarded, upon the schooner Enchantress, to Simeon Draper, the United States treasury agent in the city of New York, by whom it was subsequently sold for the account of the United States, and the proceeds thereof, amounting, as is believed, and it is here charged, to the net sum of one hundred and nineteen thousand eight hundred and fifty-seven dollars and thirty-four cents, ($119,857.34,) were duly accounted for by said Simeon Draper, and were paid into the treasury of the United States in conformity with the said captured and abandoned property act.
 '(3) On the thirty-first day of December, 1868, the firm of Erwin & Hardee, of which said Robert Erwin was a member, filed their petition in bankruptcy under the provisions of the acts of congress relating thereto, in pursuance of which, on the fifteenth day of January, 1869, they were duly adjudged bankrupts, as more fully appears in Exhibit L. C. R. No. 1. And, in the proceedings had in such bankruptcy, one Robert H. Footman was appoit ed and qualified as assignee of said Erwin & Hardee, and proceeded in the administration of the trust until February 23, 1877, when, upon his resignation thereof, your petitioner, the claimant, as appears more fully from Exhibit L. C. R. No. 2, was appointed to succeed him, and was duly qualified as assignee of said bankrupts; and the claimant now avers that under and in virtue of the assignment in bankruptcy of the property and estates of said Erwin & Hardee, and each of them, and of the proceedings had in the court in that regard, the claims of said Erwin, hereinbefore mentioned, against the United States, and for which this suit is prosecuted, became and now are vested in the claimant, who is now duly qualified and acting as assignee of said bankrupt, as is hereinbefore alleged.
 '(4) Inasmuch as the right of said Erwin to maintain the action provided of and on the fifth day of February, act for and upon the said claims was barred by the limitation of suits under said statute, a special act of congress was passed and became a law as of and on the fifthe day of February, 1877, the same being entitled 'An act for the relief of Robert Erwin;' being found in 19 St. c. 51, which enacts and reads as follows: 'Be it enacted by the senate and house of representatives of the United States of America in congress assembled that the court of claims may take jurisdiction under the provisions of the act of March 12, 1863, entitled 'An act to provide for the collection of abandoned property, and for the prevention of frauds in insurrectionary districts within the United States,' of the claims of Robert Erwin, of Savannah, Georgia, for property alleged to have been taken from him, which claims were by accident or mistake of his agent or attorney, and without fault or neglect on his part, as is claimed, not filed within the time limited by said act.'
 '(5) The claimant now avers that, under and because of said last-recited act of congress, jurisdiction was given anew to this court to hear and determine the said claims of the said Erwin in the manner and by the proceedings provided in the captured and abandoned property act. But, at the time of the enactment of said law, all the property and rights of said Erwin which existed on the thirty-first day of December, 1868, had vested, as aforesaid, in his assignee in bankruptcy; and the said claims, then and now, were and are assets of the estate of said Erwin in bankruptcy, for which the claimant alone as such assignee could, or now can, maintain the proceedings prescribed by said captured and abandoned property act, and under and in virtue of the said special and enabling act hereinbefore recited. And he now comes and brings this suit in pursuance thereof.
 '(6) He further avers and charges that the said cotton was never abandoned nor condemned as forfeited to the United States, but that the said United States retain the net proceeds thereof only as trustees for the owner thereof; and in and by the said private act, as herein recited, it has recognized the claimant's right to the proceeds thereof, upon the preferment of his claim in conformity with the provisions of the said captured and abandoned property act.
 '(7) He further avers that, except the assignment made as required by the bankrupt act, no assignment has been made at any time of the said claims, or either of them, or of any part of them, or either of them, but the same remain as assets of the said bankrupt estate; and he now claims payment thereof for the benefit of the said estate; and as such assignee he charges that he is justly entitled to have and receive the amounts herein claimed from the moneys in the treasury of the United States, so held in trust for the benefit of those who shall establish their claim to it under the provisions of the captured and abandoned property act.
 'He therefore prays for judgment against the United States for the proceeds of the said cotton so as aforesaid seized for and under the authority of the said United States, of which, at the time of its seizue , the said Robert Erwin was sole owner, and which was so sold, and the net proceeds of which, amounting in the aggregate to the sum of one hundred and sixty-nine thousand four hundred and seventy-five dollars and seventy-three cents, ($169,475.73,) have been paid into the treasury, and now remain there as a part of the fund arising under said act.
 'ALBERT SMALL, Attorney and Solicitor for Claimant.
 'SHELLABARGER & WILSON, of Counsel.'
 There was a demurrer filed on the part of the United States, coupled with a motion to dismiss. The court (RICHARDSON, C. J.) thereupon handed down the following opinion:
 
 
 1
 'This action is brought by the assignee of Robert Erwin, under the provisions of the following act of congress, (19 St. at Large, c. 51,) which became a law February 5, 1877, without the president's approval:
 
 
 2
 "An act for the relief of Robert Erwin.
 
 
 3
 "Be it enacted, etc., that the court of claims may take jurisdiction under the provisions of the act of March 12, 1863, entitled 'An act to provide for the collection of abandoned property and for the prevention of frauds in insurrectionary districts within the United States,' of the claims of Robert Erwin, of Savannah, Ga., for property alleged to have been taken from him, which claims were by accident or mistake of his agent or attorney, and without fault or neglect on his part, as is claimed, not filed within the time limited by said act.'
 
 
 4
 'The petition, which was filed February 17, 1886, alleges, as the cause of action, that 'the said Robert Erwin, then a citizen of the state of Georgia, on the twenty-first day of December, 1864, was the exclusive owner, in his own right, of 283 bales of upland cotton, stored in the said city of Savannah, which, on or about that day, was seized and captured by persons duly authorized and acting in behalf of the United States, and the proceeds of the sale made thereof, amounting, as is believed, and it is here charged, to the net sum of $49,618.39, were paid into the treasury of the United States, pursuant to the provisions of the act of congress approved March 12, 1863, (chapter 120,) commonly called the 'Captured and Abandoned Property Act.' And on or about the first day of July, 1865, he was also the owner, exclusively, and in his own right, of another lot of 261 bales of sea-island cotton, then stored at and in the warehouse of Evans & Parnell, in the town of Thomasville, in said state of Georgia, which, on or about that day, was also so seized and captured by persons duly authorized and acting in behalf of the United States, was removed to and stored at the government cotton-press in the city of Savannah, where it remained in the custody of said agents of the United States until in the month of August following, when it was by them forwarded, upon the schooner Enchantress, to Simeon Draper, the United States treasury agent in the city of New York, by whom it was subsequently sold for the account of the United States; and the proceeds thereof, amounting, as is believed and it is here charged, to the net sum of $119,857.34, were duly accounted for by Simeon Draper, and were paid into the treasury of the United States in conformity with the said captured and abandoned property act. On the thirty-first day of December, 1868, the firm of Erwin & Hardee, of which said Robert Erwin was a member, filed their petition in bankruptcy under the provisions of the acts of congress relating thereto, in pursuance of which, on the fifteenth of January, 1869, they were duly adjudged bankrupts. And in the proceedings had in such bankruptcy one Robert H. Footman was appointed and qualified as assignee of said Erwin & Hardee, and proceeded in the administration of the trust until February 23, 1877, when, uypon his resignation thereof, your petitioner, the claimant, was appointed to succeed him, and was duly qualified as assignee of said bankrupts, and the claimant now avers that under and in virtue of the assignment in bankruptcy of the when, upon his resignation thereof, your & Hardee, and each of them, an of the proceedings had in the court in that regard, the claims of said Erwin, hereinbefore mentioned, against the United States, and for which this suit is prosecuted, became and now are vested in the claimant, who is now duly qualified and acting as assignee of said bankrupt, as is hereinbefore alleged.'
 
 
 5
 'The defendants file a motion to dismiss for want of jurisdiction, and also a general demurrer, under each of which three objections are raised against the claimant's petition: '1. It is argued that the act under which the suit is brought was, in the words of the title, 'for the relief of Robert Erwin,' and not for his creditors through the assignee in bankruptcy previously appointed, and that the latter acquired no rights thereby, both because the act was not intended for him (Strong v. Hopkins, 2 Paine, 584,) and because the right to sue was a valuable right or privilege acquired after the appointment of the assignee, and did not pass by the assignment.
 
 
 6
 '2. It is also argued that an assignee in bankruptcy has no right to keep the estate open, and bring actions nine years after his appointment. Rev. St. § 5057; Bailey v. Glover, 21 Wall. 346; Walker v. Towner, 4 Dill. 165.
 
 
 7
 'We express no final opinion on these two points, although we are inclined to think that one of them, at least, is well taken. They merit serious consideration, and could not be passed by did we not prefer to rest our decision upon the third objection, which concerns more particularly the jurisdiction of this court. But they will be open to the defendants in the supreme court on appeal, if the case should go there.
 
 
 8
 '3. The third objection is that the claim, under the act of 1877, accrued more than six years before the filing of the petition, and so is forever barred by the following section of the Revised Statutes, which was held by the supreme court, in Haycraft's Case, 22 Wall. 81, 10 Ct. Cl. 108, to be jurisdictional:
 
 
 9
 "Sec. 1069. Every claim against the United States cognizable by the court of claims shall be forever barred unless the petition setting forth a statement thereof is filed in the court, or transmitted to it by the secretary of the senate or the clerk of the house of representatives, as provided by law, within six years after the first claim accrues: Provided, that the claims of married women first accrued during marriage, of persons under the age of twenty-one years first accrued during minority, and of idiots, lunatics, insane persons, and persons beyond the seas at the time the claim accrued, entitled to the claim, shall not be barred if the petition be filed in the court, or transmitted as aforesaid, within three years after the disability has ceased; but no other disability than those enumerated shall prevent any claim from being barred, nor shall any of the said disabilities operate cumulatively.'
 
 
 10
 'A claim first accrues, within the meaning of the statute, when a suit may first be brought upon it, and from that day the six-years limitation begins to run. Any suit under the act of February 5, 1877, might have been instituted by filing a petition within six years after that date. That time has long since passed, and the present claimant has lost his rights thereunder, if he ever had any, unless his case is taken out of the operation of section 1069, Rev. St., in either of two ways which his counsel present. In his behalf it is insisted that the section applies only to claims which came under the general jurisdiction of the court before its enactment, and not to claims founded upon special acts subsequently passed. We do not concur in this view.
 
 
 11
 'A similar doctrine in relation to the right of appeal under section 707, Rev. St., was considered by the supreme court in Zellner's Case, 9 Wall. 244, 7 Ct. Cl. 137. The court say: 'It is supposed, as the act concerning captured and abandoned property conferred upon the court of claims a new subject of jurisdiction in addition to those previously provided for, and at the same time made no provision for the appa ls to the supreme court from their judgments or decrees, no right of appeal existed in respect to either party, and that the general provision in the fifth section of the act of March 3, 1863, reorganizing the court, and conferring what may be called its general jurisdiction, cannot be invoked in this case. We cannot agree to this view. The language of the section is general: 'Either party may appeal to the supreme court of the United States from any final judgment or decree which may hereafter be rendered in any case by said court.' This court was organized as a special judicial tribunal to hear and render judgment in cases between the citizen and the government. The subjects of its jurisdiction were defined in the act, and generally the mode of conducting its proceedings, subject, of course, to such alterations and changes as congress from time to time might see fit to make. The subjects of its jurisdiction could be enlarged or diminished, but this would not disturb in any way or affect the general plan or system of its organization. If new or additional subjects of jurisdiction were conferred, the effect would be simply to increase the labors of the court, the case to be heard and determined under the existing organization.'
 
 
 12
 'In McKee's Case, 10 Ct. Cl. 208, the supreme court held expressly that 'section 707, Rev. St., gives to the United States the right of appeal from the adverse judgments of the court of claims in all cases where that court is required by any general or special law to take jurisdiction of a claim made against the United States, and act judicially in its determination.' And the supreme court took jurisdiction of an appeal from this court upon a judgment rendered against Robert Erwin under this very act of 1877, although the only authority for it was found in section 707, Rev. St.
 
 
 13
 'There is no distinction in principle between the application of the right of appeal, under section 707, to special acts of legislation subsequently passed, and the application of the limitation of section 1069 to such cases. The act of 1877 created a new and additional subject of jurisdiction, and a new cause of action, by reviving an expired one, and, in our opinion, the general statute of limitation, as well as the general right of appeal, attaches and applies to it; just as when part payment on a promissory note takes a right of action thereon out of the statute, such right is not forever after relieved from all limitation, but the statute begins to run anew from the date of such payment. It is now more than nine years since this court was opened anew to the rightful claimant, whoever he may be, under the act of 1877; and, according to the construction urged by the present claimant, it is never to be closed until he be found, and of his own motion comes in and files his petition,—a construction which, in our opinion, is unreasonable, and not to be adopted. While congress has declared a general limitation of six years for 'every claim cognizable by the court of claims,' and a still shorter one of two years for claims under the captured or abandoned property act, it is unreasonable to infer that it intended to confer upon every claimant under the act of 1877—and the present one is the second who has appeared (Erwin's Case, 13 Ct. Cl. 49, affirmed on appeal, 97 U. S. 392)—the unusual and extraordinary privilege accorded to no other citizen, of bringing suit against the government at any future time without limitation. Such a construction would be in conflict with all idea of repose, which is said to be the object of statutes of limitation, and to the general policy of congress in all other cases.
 
 
 14
 'It was said in Clark's Case, 11 Ct. Cl. 702, decided a year before the passage of the act of 1877 now under consideration: 'It is not to be doubted that subsequent subjects of jurisdiction would be subject to the provisions of the statute of limitation if they were in the nature of money demands against the government.' This was then, and has ever since been, the settled doctrine of this court, and we have no doubt congress so understood it when the act of 1877 was passed.
 
 
 15
 'That the present claim, under that act, is a money demand against the government, and nothing else, we shall demonstrate beyond question, we are quite confident.
 
 
 16
 'But the claimant argues that the property received and sold, and the proceeds thereof in the treasury, under the peculiar legislation of the captured or abandoned act of March 12, 1863, (12 St. at Large, 820,) are trust funds, of which the defendants are merely trustees, and are subject to the rules and practice of courts of equity in relation to equitable trusts, one of which is that statutes of limitation do not run as between trustee and cestui que trust.
 
 
 17
 Some dicta, in early opinions of the supreme court arising under that act, have no doubt led to an erroneous impression that this court is to administer cases under it as though they were causes in equity, subject to the law of equitable trusts as applied in courts having chancery jurisdiction. In Klein's Case, 13 Wall. 128, and 7 Ct. Cl. 240, CHASE, C. J., in his opinion, said: 'The government constituted itself the trustee for those who were by that act declared entitled to the proceeds of captured and abandoned property, and for those whom it should thereafter recognize as entitled. * * * The property of the original owner is in no case absolutely divested. There is, as we have already observed, no confiscation, but the proceeds of the property have passed into the possession of the government, and restoration of the property is pledged to none except to those who have continually adhered to the government. Whether restoration will be made to others, or confiscation wil be enforced, is left to be determined by considerations of public policy. * * * It was for the government itself to determine whether such proceeds should be restored to the owner or not.'
 
 
 18
 'The doctrine now insisted upon as to trust and trusteeship is founded on that dictum. The case itself did not involve any consideration of the principles of equity as applied to trusts and trustees, and it does not appear exactly what, if any, such principles the learned chief justice understood might be invoked in the execution of the statute. But he does say that it was for the government itself to determine whether these proceeds should be restored to the owner or not. While Mr. Chase was secretary of the treasury, and for some time afterwards, the money received from captured and abandoned property was merely deposited with the treasurer, and was not technically, in departmental language, 'covered into the treasury,' and so, according to the construction then given by the department, was not subject to the constitutional provision that 'no money shall be drawn from the treasury but in consequence of appropriations made by law.' Const. art. 1, § 9, par. 6. More than two and a half million dollars of it was paid out by Secretaries Chase, Fessenden, and McCulloch, (Hodges' Case, 18 Ct. Cl. 704,) without any appropriation therefor, when congress interposed and passed the joint resolution of March 30, 1868, No. 25, (15 St. at Large, 251.) That resolution required all moneys received from sales of captured and abandoned property to be paid into the treasury of the United States, and they were thereupon 'covered into the treasury,' and mingled with other public money. No account has since been kept of the same as a separate fund, and as such they are not known except outside of the treasury department. Receipts and expenditures are entered as in other cases, and the statements which, from time to time, have been made, by request, relating thereto, have been taken from the scattered items of receipts and expenditures. Hodges' Case, 18 Ct. Cl. 700. The permanent appropriation for the payment of judgments of this court in captured and abandoned property cases is not chargeable to any fund, but is payable 'out of moneys in the treasury not otherwise appropriated.' Rev. St. § 3689. It is not at all improbable tha this legislation, enacted after Secretary Chase had left the department, escaped the observation of the chief justice when he wrote the dicta quoted from his opinion in Klein's Case.
 
 
 19
 'A trust in which the so-called trustee may legally mingle the trust money with his own, employ it for his own use, and himself determine whether he will forever retain it, or will give it to others, is a singular trust, unknown to law or equity, and to which no principles of equity jurisprudence can be found to apply. It is a universal rule of equity that if a trustee mingles trust money with his own, and uses it for his own benefit, he shall account for or pay interest thereon to the cestui que trust. Story, Eq. §§ 1277, 1277a; Perry, Trusts, § 468. But it is provided in Revised Statutes as follows:
 
 
 20
 'Sec. 1091. No interest shall be allowed on any claim up to the time of the rendition of judgment thereon by the court of claims unless upon a contract expressly stipulating for the payment of interest.' This court has always applied that section to cases under subsequently enacted special acts, and to those under the captured or abandoned property act. The claimant here might as well invoke the rule of equity as to interest, and demand payment of interest on the money received for the cotton in question, notwithstanding section 1091, Rev. St., as to invoke the equitable rule that statutes of limitation do not run in favor of trustees against the beneficiaries of the estate held by them.
 
 
 21
 'But more recent decisions, and the practice of this court and of the supreme court, have swept away all such ideas of trust in connection with the property or money received under the captured or abandoned property act. In Haycraft's Case, 22 Wall. 94, 95, 10 Ct. Cl. 110-112, the supreme court said, respecting captured and abandoned property, speaking by Chief Justice WAITE: 'The act of congress looked to its preservation, but authorized its capture. In so doing congress acted within its constitutional powers to 'make regulations concerning captures on land and water.' Article 1, § 8, par. 11. In the indiscriminate seizure which was likely to follow such an authority, it was anticipated that friends as well as foes might suffer. Therefore, to save friends, it was provided that any person claiming to have been the owner, at any time within two years after the suppression of the rebellion, might prefer his claim, and, upon proof of his ownership and loyalty, receive the money realized by the United States from the sale of the property. That expresses all there is of the trust or the remedy provided.' This certainly does not recognize much of a trust. It is no more so than is that upon which every person holds the property which is exclusively his own,—to be managed as he sees fit, and to be disposed of as he pleases. In such a trust, if that be not a misnomer, the special principles of equity do not apply, and courts of equity do not interfere.
 
 
 22
 'In Burke's Case, 13 Ct. Cl. 231, this court, speaking by Judge BANCROFT DAVIS, said: 'It is argued that this court sits as a court of equity in proceedings under the captured and abandoned property act, and that we must resort to equity to determine the status of this claimant. * * * An early attempt of this court to render judgment under the general act for specific performance (Alire's Case, 1 Ct. Cl. 233) was met by the supreme court by the remark that 'it is quite clear that the limited power to render a judgment confines the subject-matter to cases in which the petitioner sets up a moneyed demand as due from the government.' Alire's Case, 6 Wall. 573. Shortly afterwards the same court held that this court 'was authorized to enforce legal rights and obligations, but it could not proceed further, and judge of the equities between a citizen and his government.' * * * The government has not thought fit to allow itself to be sued in the court of claims on equitable considerations. Bonner's Case, 9 Wall. 156. About the same time, a question being raised concerning proceedings in cotton cases, the same court said: 'No special proceedings are prescribed to the court of claims' by the captured and abandoned property act, but 'they are to proceed in the usual way to hear and adjudicate upon the question of ownership and right to the proceeds according to the proofs and the law of the case.' Zellner's Case, 9 Wall. 244. Nearly simultaneously with these proceedings, however, the supreme court, in casual expressions in two cases, referred to the United States as a trustee holding the proceeds of captured and abandoned property for the owner's benefit, (Anderson's Case, 9 Wall. 56; Padelford's Case, Id. 531,) which expressions were repeated in two subsequent cases, (Klein's Case, 13 Wall. 128; Intermingled Cotton Cases, 92 U. S. 651.) From these casual expressions it is argued that we are possessed of the equity jurisdiction necessary to administer upon trusts, and that the supreme court was mistaken when it said that 'the government has not thought fit to allow itself to be sued in the court of claims on equitable consideration.' That court, in calling the United States a trustee, may have referred to the large class of trusts cognizable at law. In its broad legal sense, the word 'trust' embraces many transactions and relations of business and property which are administered in courts of common law in states where two systems of jurisprudence and of remedies exist side by side. The familiar cases of bailments and of money had and received to the use of another are instances of such trusts.
 
 
 23
 The court may well have compared the relations of the government towards the fund in the treasury to this class of trusts. It is less probable that it intended to convert those relations into an equitable trust, since the essential elements of personal confidence and trust reposed in the depositary by the creator of the trust are wholly wanting. The language of Chief Justice WAITE in Haycraft's Case, where he 'expresses all there is of trust,' (22 Wall. 94,) warrants this conclusion. In administering upon the cotton cases this court has neither assumed to act as a court of equity, nor as a court of common law, but simply as the court of claims. Dicta of individual judges may afford ground for arguing in favor of equity jurisdiction in case of necessity, but no necessity for its exercise has yet arisen.'
 
 
 24
 'Moreover, if actions upon claims for the proceeds of property received under the provisions of the captured or abandoned property act were to be tried in equity, this court would have been relieved from making findings of fact in such cases, and the whole record, evidence and all, would be sent up to the supreme court on appeal. Hot Springs Cases, 10 Ct. Cl. 345, and 92 U. S. 698, 11 Ct. Cl. 238; Eastern Band of Cherokees' Case, 20 Ct. Cl. 461, and 117 U. S. 288, 6 Sup. Ct. Rep. 718; McClure's Case, 116 U. S. 145, 6 Sup. Ct. Rep. 321. But this court and the supreme court have never so regarded them, and a finding of facts has been required and has been made in every case under the abandoned or captured property act, as in other actions at law, and not in equity. See De Groot's Case, 5 Wall. 419, and 7 Ct. Cl. 2; Mahan's Case, 14 Wall. 109, and 7 Ct. Cl. 282; Pugh's Case, 99 U. S. 271. Nor has there been a single case where, in this court or in the supreme court, the special and peculiar principles of equity jurisprudence have been applied. The reason why the general statute of limitation did not apply to the captured and abandoned property act as originally enacted was that the latter had a shorter limitation of its own which took it out of, or was a limitation upon, the general statute. Fendall's Case, 16 Ct. Cl. 120. But the act of 1877, under which this suit is brought, has no special limitation of its own, and the reason wanting, the exception fails. Cessante ratione legis, cessat ipsa lex.
 
 
 25
 'In Taylor's Case, 104 U. S. 216, 222, the supreme court called the United States trustees of the sup lus money paid into the treasury from the sales of lands for taxes under the direct tax acts (12 St. at Large, 292, 422, 640; 14 St. at Large, 568) over and above that which was required to pay the tax, interest, and costs. That court did not treat the case as one in equity, and upon findings of fact by this court, as in cases at law, they held, as to the statute of limitations, that 'the right of the owner of the land to recover the money which the government held for him as his trustee did not become a claim on which suit could be brought, and such as was cognizable by the court of claims, until demand therefor ahd been made at the treasury. Upon such demand the claim first accrued,' and the statute of limitations began to run. So, in the present case, a suit cognizable by the court of claims could not have been brought after the limitation of the captured or abandoned property act had expired until the passage of the act of 1877 specially authorizing it, and from that time the statute of limitations began to run, and had run out long before the claimant came into court.
 
 
 26
 'The petition is dismissed.'
 
 
 27
 NOTT, J., delivered the following dissenting opinion:
 
 
 28
 'The plain and simple question in this case is whether the statute of limitations (Rev. St. § 1069) applies to the subject of jurisdiction known as the 'Captured Property Cases.' In Haycraft's Case, 22 Wall. 81, the counsel for the claimant asked the same question, and the supreme court answered that it did not. The argument which was addressed to the supreme court in that case will be found set forth (not in extenso) in 10 Ct. Cl. 95-104. It is an argument of extraordinary ingenuity, ability, learning, and earnestness. There have been several attempts since then to change the trust into implied contract, and to change the limited responsibility of the government as a trustee into the more extended responsibility of a stakeholder or bailee, but every idea and argument and illustration which have been advanced will be found more fully and forcibly set forth in the claimant's argument in Haycraft's Case. The object of that argument was to establish the position that the holding of the government was an implied trust, and the character of the government that of a stakeholder or bailee, as to which the law implies a contract to pay over the money to the rightful owner; and hence that the six-years statute of limitations was applicable to such cases. The supreme court answered that no implied contract existed; that the character of the government was that of a trustee; and that such cases did not come within the statute of limitations. The statute of limitations was made for the protection of the government, and is applicable to all cases where the government has incurred a personal liability. The jurisdictional period of two years prescribed by the abandoned or captured property act (12 St. at Large, 820, § 3) was made for the protection of claimants, and to enable them all to come before the court at the same time, to the end that each might defend his own share of the fund from the adverse demands of adverse claimants. The two systems have been administered as distinct systems, without one single exception, until the present day; and how completely distinct they have been kept will be best understood from the following illustrations:
 
 
 29
 'The act March 3, 1863, (12 St. at Large, 765,) which reconstituted this court, and created the statute of limitations, (section 10,) likewise created the right of appeal, (section 5,) and a liability for interest, (section 7.) It is expressly provided 'that every claim against the United States cognizable by the court of claims shall be forever barred unless the petition be filed' within six years; but it is also expressly provided 'that, in all cases of final judgments by said court' in favor of the claimant, 'interest thereon at the rate of 5 per cent, shall be allowed.' Many judgments in favor of claimants were recovered in the captured property cases, and many, and for large amounts, wee suspended by appeals to the supreme court; yet in no case was interest upon such a judgment ever allowed or paid. If there was a personal liability on the part of the government in those cases as to which it can invoke the protection of the statute of limitations, then there was a personal liability for interest pending an appeal on those judgments, which, certainly, in law, in equity, and in good conscience, it is still bound to pay, as is very clearly shown by our brother, Mr. Justice SCOFIELD, in Hobb's Case, 19 Ct. Cl. 220. The Case of Zellner, 9 Wall. 244, was the first captured cotton case which came before the supreme court, and there are expressions in the opinion which have frequently been miscited and misunderstood. The decision was rendered in proceedings to obtain a mandamus, and relates to the single question of there being a right to appeal in that class of cases. The langugae of the opinion is to be construed in connection with that fact. Several years afterwards the Elgee Cotton Case, 10 Ct. Cl. 181, came before the court,—a case elaborately argued on behalf of the three adverse claimants,—and there it was said of suits under the abandoned or captured property act: 'That statute [act March 12, 1863] furnishes a complete system for the prosecution of claims under it, and defines the extent of the rights which those who claim an interest in the proceeds of property captured or abandoned during the civil war may assert against thegovernment.' The two decisions are not inconsistent. The former relates to a matter of practice and procedure, as to which it holds the general provisions of law governing practice and procedure applicable; the latter to rights and equities, as to which it holds the abandoned or captured property act to constitute a complete system.
 
 
 30
 'What, then, is the condition of the claimant's case? On the twentieth August 1868, Robert Erwin was the equitable owner of a fund in the treasury, of which the equitable title had never been divested from himself, being then held by the government as his trustee. On that day he might have instituted a suit for the fund, but on that day the jurisdictional period for instituting such suits expired. A provision of law confining jurisdiction to a certain period no more affects the party or the cause of action than a provision of law confining jurisdiction to a certain territory. Therefore Erwin's right to the fund did not expire with the right of the court to entertain his case. The effect of the statute was simply that on that day, as to such cases, the door of the court was shut. On the fifth February, 1877, congress reopened the door by passing the private act, (19 St. at Large, c. 51.) The original abandoned or captured property act said that the door should stand open for two years; the private act set no limitation of that kind, but leaves it open still, and still continues to declare that 'the court of claims may take jurisdiction' of the claim. The private act does not re-create the claim; it does not validate it; it does not remove the presumption of payment from it; it simply opens the doors of the court, and allows whoever may be entitled to do so to bring the claim in. Why, then, should not the claim be heard? The grant of jurisdiction has not expired; the private act has not been repealed; it still continues to say: 'The court of claims may take jurisdiction under the provisions of the act of March 12, 1863,' 'of the claims of Robert Erwin.' Why, then, should not the court of claims take jurisdiction and adjudge the case? The counsel for the government answers that the general statute of limitations applies to this demand, and bars the suit.
 
 
 31
 'If the statute of limitations applies so as to preclude a trial upon the merits, it must apply not to the door of jurisdiction, but to the claim itself. Statutes of limitation are statutes of repose, which do not extend to courts nor affect jurisdiction, but which attach to a debt or demand a presumption of payment, and operate to extingus h the thing itself as completely as if payment had been made. Therefore, if the statute of limitations applies to this claim, neither Robert Erwin, nor his assignee, nor any other person, can ever assert a right to the fund derived from his cotton. All other claimants can; but this claim must be considered in law as actually paid and extinguished. It is conceded that the claim was not so extinguished when the private law was passed. It is conceded that none of the thousands of other claims which are still outstanding upon the captured property fund is presumptively or legally extinguished by the statute of limitations. Why, then, is this? How is it possible that congress by passing an act, without the solicitation of the legal owner of the claim, the present claimant, authorizing a court to take jurisdiction of a case, and nothing more, can have attached to the claim itself another statute not previously applicable to it, which should in time work out a legal presumption of payment and an absolute extinguishment of the claimant's rights? If it be asked whether this thing can go on forever, the answer seems a very plain one. Congress did not here pass a general act, nor an act affecting a class of claims, but a grant of special jurisdiction for the benefit of a single, isolated case. The acts of grace and favor did not confer a right, but provided a remedy. Congress can take away the remedy at any time without trenching upon the claimant's rights.
 
 
 32
 'The counsel for the claimant has supposed that, in the administration of the abandoned or captured property act, the fund in the treasury was treated by this court as a fund in equity, and the counsel is right in his supposition. Considering that it dealt with millions, and must involve some of the most perplexing questions that could possibly be brought before a court, that act was in one particular probably the most extraordinary statute that was ever enacted. All that relates to the jurisdiction and duties of the court, and to the rights and disabilities of the parties, is to be found in nine lines which are thrust into a section primarily relating to the bonds and books of account of agents of the treasury. The judges who had to bear the heat and burden of that day in determining principles, in devising remedies, in framing a system which should be commensurate with the necessities of the situation,—that is to say, the judges who administered the statute from the Case of Tibbetts, 1 Ct. Cl. 169, to the Case of Boyd, 9 Ct. Cl. 419,—had an absolutely novel subject of jurisprudence assigned to them, without one word of statutory guidance to direct them, and without a precedent to be gathered from all the courts in the world. Whatever may be thought of the wisdom of their conclusion, one thing is incontrovertible, and that is that they eventually believed the fund in the treasury to be a fund in equity, and that they exercised in regard to it whatever power of a court of equity might be necessary to protect the fund. The interlocutory proceedings (4 Ct. Cl. 486; 5 Ct. Cl. 645) and the final decree (7 Ct. Cl. 605) in the Elgee Cotton Case and the decree in the Case of Rothschild, (6 Ct. Cl. 220,) will illustrate to any lawyer with any knowledge of equity jurisdiction that the court was dealing with rights and remedies which belong to the discretionary powers of a court of equity, and which are not the rights and remedies that come within the inflexible jurisdiction of a court of law. Some attempts have been made to show that courts of law have dealt with implied trusts in some such way, but the only authorities that could be found were Bacon's Abridgement and Reeve's History of the Common Law, and they, unhappily, related to a time when the court of chancery did not exist as a court of equity, and when the system of equity jurisprudence was not yet devised. But I do not regard the statute of limitation as necessarily exclusive of equity cases. I place my conclusion here entirely upon the ground that the private act grane d a remedy; that the remedy was not limited as to time; and that there is no law which attaches to this claim a presumption of payment.'
 
 
 33
 WAITE, C. J., announced that the judgment of the court of claims was affirmed by a divided court.